# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## *v.* WYOMING ET AL.

No. 81–554.   Argued October 5, 1982—Decided March 2, 1983

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 244. BURGER, C. J., filed a dissenting opinion, in which POWELL, REHNQUIST, and O'CONNOR, JJ., joined, *post*, p. 251. POWELL, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 265.

*Solicitor General Lee* argued the cause for appellant. With him on the briefs were *Deputy Solicitor General Wallace, George W. Jones, Michael J. Connolly, Philip B. Sklover,* and *Vella M. Fink.*

*Bruce A. Salzburg,* Senior Assistant Attorney General of Wyoming, argued the cause for appellees. With him on the briefs was *Steven F. Freudenthal,* Attorney General.*

---

*\*Steven J. Cole* and *Richard Kirschner* filed a brief for the American Federation of State, County and Municipal Employees, AFL–CIO, as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Alabama et al. by *Charles A. Graddick,* Attorney General of Alabama, and

JUSTICE BRENNAN delivered the opinion of the Court.

Under the Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.* (1976 ed. and Supp. V) (ADEA or Act), it is unlawful for an employer

*Algert S. Agricola, Jr.*, Assistant Attorney General, *Robert K. Corbin*, Attorney General of Arizona, and *Anthony B. Ching*, Solicitor General, *Michael J. Bowers*, Attorney General of Georgia, and *Gary R. Hurst*, Assistant Attorney General, *Tany S. Hong*, Attorney General of Hawaii, *Tyrone C. Fahner*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, and *James F. Schmidt*, Deputy Attorney General, *William J. Guste, Jr.*, Attorney General of Louisiana, and *Kendall L. Vick*, Assistant Attorney General, *Frank J. Kelly*, Attorney General of Michigan, and *Susan Peck Iannotti*, Assistant Attorney General, *John Ashcroft*, Attorney General of Missouri, *Louis J. Caruso*, Solicitor General, and *Preston Dean*, Assistant Attorney General, *Michael J. Greely*, Attorney General of Montana, and *F. Woodside Wright*, Special Assistant Attorney General, *Paul L. Douglas*, Attorney General of Nebraska, and *Bernard L. Packett*, Assistant Attorney General, *William J. Brown*, Attorney General of Ohio, and *James R. Rishel*, *Rufus L. Edmisten*, Attorney General of North Carolina, and *Douglas A. Johnston*, Assistant Attorney General, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, and *Debra K. Wallet*, Deputy Attorney General, *William M. Leech, Jr.*, Attorney General of Tennessee, and *Michael E. Terry*, Deputy Attorney General, *Mark White*, Attorney General of Texas, and *William O. Goodman*, Assistant Attorney General, *David L. Wilkinson*, Attorney General of Utah, and *Stephen G. Schwendiman*, Assistant Attorney General, *John J. Easton, Jr.*, Attorney General of Vermont, and *Denise Johnson*, Assistant Attorney General, and *Jack Avery*, Attorney General of Guam; for the State of California et al. by *George Deukmejian*, Attorney General of California, *Willard A. Shank*, Chief Assistant Attorney General, *Richard D. Martland*, Assistant Attorney General, and *Mary C. Michel*, Deputy Attorney General, and *Charles A. Graddick*, Attorney General of Alabama, and *Algert S. Agricola, Jr.*, Assistant Attorney General; for the County of Marathon, Wisconsin, et al. by *Charles C. Mulcahy*, *Michael R. Wherry*, and *William J. Mulligan;* for the City of Baltimore by *Benjamin L. Brown* and *Ambrose T. Hartman;* and for the National Institute of Municipal Law Officers by *James B. Brennan*, *Henry W. Underhill, Jr.*, *Benjamin L. Brown*, *J. Lamar Shelley*, *Roy D. Bates*, *Roger F. Cutler*, *Alan J. Davis*, *John Dekker*, *Lee E. Holt*, *George F. Knox, Jr.*, *Walter M. Powell*, *William H. Taube*, *John W. Witt*, *Max P. Zall*, *Conard B. Mattox, Jr.*, and *Charles S. Rhyne.*

to discriminate against any employee or potential employee on the basis of age, except "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age."[1] The question presented in this case is whether Congress acted constitutionally when, in 1974, it extended the definition of "employer" under § 11(b) of the Act to include state and local governments. The United States District Court for the District of Wyoming, in an enforcement action brought by the Equal Employment Opportunity Commission (EEOC or Commission), held that, at least as applied to certain classes of state workers, the extension was unconstitutional. 514 F. Supp. 595 (1981). The Commission filed a direct appeal under 28 U. S. C. § 1252, and we noted probable jurisdiction. 454 U. S. 1140 (1982). We now reverse.

## I

Efforts in Congress to prohibit arbitrary age discrimination date back at least to the 1950's.[2] During floor debate over what was to become Title VII of the Civil Rights Act of 1964, amendments were offered in both the House and the Senate to ban discrimination on the basis of age as well as race, color, religion, sex, and national origin. These amendments were opposed at least in part on the basis that Congress did not yet have enough information to make a considered judgment about the nature of age discrimination, and each was ultimately defeated. 110 Cong. Rec. 2596–2599, 9911–9913, 13490–13492 (1964); EEOC, Legislative History of the Age Discrimination in Employment Act 5–14 (1981) (hereinafter Legislative History). Title VII did, however,

---

[1] See *infra*, at 231–233.

[2] See Age Discrimination in Employment: Hearings on S. 830 and S. 788 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess., 23 (1967) (statement of Sen. Javits); Note, 47 S. Cal. L. Rev. 1311, 1325 (1974).

include a provision, § 715, 78 Stat. 265 (since superseded by § 10 of the Equal Employment Opportunity Act of 1972, 86 Stat. 111), which directed the Secretary of Labor to "make a full and complete study of the factors which might tend to result in discrimination in employment because of age and of the consequences of such discrimination on the economy and individuals affected," and to report the results of that study to Congress. That report was transmitted approximately one year later. Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment (1965), Legislative History 16–41.

In 1966, Congress directed the Secretary of Labor to submit specific legislative proposals for prohibiting age discrimination. Fair Labor Standards Amendments of 1966, § 606, 80 Stat. 845. The Secretary transmitted a draft bill in early 1967, see 113 Cong. Rec. 1377 (1967), and the President, in a message to Congress on older Americans, recommended its enactment and expressed serious concern about the problem of age discrimination, see Special Message to the Congress Proposing Programs for Older Americans, 1 Public Papers of the Presidents, Lyndon B. Johnson, 1967, pp. 32, 37 (1968). Congress undertook further study of its own, and Committees in both the House and the Senate conducted detailed hearings on the proposed legislation. See Age Discrimination in Employment: Hearings on S. 830 and S. 788 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess. (1967); Age Discrimination in Employment: Hearings on H. R. 3651 et al. before the General Subcommittee on Labor of the House Committee on Education and Labor, 90th Cong., 1st Sess. (1967); see also Retirement and the Individual: Hearings before the Subcommittee on Retirement and the Individual of the Senate Special Committee on Aging, 90th Cong., 1st Sess. (1967).

The report of the Secretary of Labor, whose findings were confirmed throughout the extensive factfinding undertaken

by the Executive Branch and Congress, came to the following basic conclusions: (1) Many employers adopted specific age limitations in those States that had not prohibited them by their own antidiscrimination laws, although many other employers were able to operate successfully without them. (2) In the aggregate, these age limitations had a marked effect upon the employment of older workers. (3) Although age discrimination rarely was based on the sort of animus motivating some other forms of discrimination, it was based in large part on stereotypes unsupported by objective fact, and was often defended on grounds different from its actual causes. (4) Moreover, the available empirical evidence demonstrated that arbitrary age lines were in fact generally unfounded and that, as an overall matter, the performance of older workers was at least as good as that of younger workers. (5) Finally, arbitrary age discrimination was profoundly harmful in at least two ways. First, it deprived the national economy of the productive labor of millions of individuals and imposed on the governmental treasury substantially increased costs in unemployment insurance and federal Social Security benefits. Second, it inflicted on individual workers the economic and psychological injury accompanying the loss of the opportunity to engage in productive and satisfying occupations.

The product of the process of factfinding and deliberation formally begun in 1964 was the Age Discrimination in Employment Act of 1967. The preamble to the Act emphasized both the individual and social costs of age discrimination.[3]

---

[3] "(a) The Congress hereby finds and declares that—

"(1) in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;

"(2) the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;

The provisions of the Act as relevant here prohibited various forms of age discrimination in employment, including the discharge of workers on the basis of their age. § 4(a), 29 U. S. C. § 623(a).[4] The protection of the Act was limited, however, to workers between the ages of 40 and 65, § 12(a), 29 U. S. C. § 631, raised to age 70 in 1978, Age Discrimination in Employment Act Amendments of 1978, § 3(a), 92 Stat. 189. Moreover, in order to insure that employers were per-

---

"(3) the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;

"(4) the existence in industries affecting commerce of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.

"(b) It is therefore the purpose of this Act to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." § 2, 29 U. S. C. § 621.

[4] Section 4(a) of the Act, 29 U. S. C. § 623(a), provides:

"It shall be unlawful for an employer —

"(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

"(3) to reduce the wage rate of any employee in order to comply with this Act."

The Act has roughly parallel provisions covering employment agencies and labor organizations. §§ 4(b), (c), 29 U. S. C. §§ 623(b), (c). In addition, it prohibits employers, employment agencies, and labor organizations from retaliating against persons who seek to enforce the Act, § 4(d), 29 U. S. C. § 623(d), and from publishing certain types of discriminatory employment notices, § 4(e), 29 U. S. C. § 623(e).

mitted to use neutral criteria not directly dependant on age, and in recognition of the fact that even criteria that are based on age are occasionally justified, the Act provided that certain otherwise prohibited employment practices would not be unlawful "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age." § 4(f)(1), 29 U. S. C. § 623(f)(1).

The ADEA, as originally passed in 1967, did not apply to the Federal Government, to the States or their political subdivisions, or to employers with fewer than 25 employees. In a Report issued in 1973, a Senate Committee found this gap in coverage to be serious, and commented that "[t]here is . . . evidence that, like the corporate world, government managers also create an environment where young is somehow better than old." Senate Special Committee on Aging, Improving the Age Discrimination Law, 93d Cong., 1st Sess., 14 (Comm. Print 1973), Legislative History 231. In 1974, Congress extended the substantive prohibitions of the Act to employers having at least 20 workers, and to the Federal and State Governments.[5]

---

[5] Congress extended the Act to cover state and local governments by amending the definition of "employer" under § 11(b) of the Act, 29 U. S. C. § 630(b). (At the same time, Congress amended the definition of "employee" under § 11(f) of the Act, 29 U. S. C. § 630(f), to *exclude* state and local elected officials and certain non-civil-service appointed officials.) It extended the Act to cover federal workers by enacting a separate provision, § 15, 29 U. S. C. § 633a (1976 ed. and Supp. V), which created an independent enforcement mechanism under the jurisdiction of the Equal Employment Opportunity Commission. In 1978, at the same time that Congress raised the upper bound of the Act's protection for state, local, and private employees from age 65 to age 70, it removed the cap entirely for federal workers. Age Discrimination in Employment Act Amendments of 1978, § 3(a), 92 Stat. 189, 29 U. S. C. § 631(b) (1976 ed. and Supp. V).

## II

Prior to the District Court decision in this case, every federal court that considered the question upheld the constitutionality of the 1974 extension of the Age Discrimination in Employment Act to state and local workers as an exercise of Congress' power under either the Commerce Clause or § 5 of the Fourteenth Amendment.[6]

This case arose out of the involuntary retirement at age 55 of Bill Crump, a District Game Division supervisor for the Wyoming Game and Fish Department. Crump's dismissal was based on a Wyoming statute that conditions further employment for Game and Fish Wardens who reach the age of 55 on "the approval of [their] employer."[7] Crump filed a

---

[6] *E. g.*, *Arritt* v. *Grisell*, 567 F. 2d 1267, 1269–1270 (CA4 1977); *Carpenter* v. *Pennsylvania Liquor Control Bd.*, 508 F. Supp. 148 (ED Pa. 1981); *EEOC* v. *Pennsylvania Liquor Control Bd.*, 503 F. Supp. 1051, 1052–1053 (MD Pa. 1980); *Marshall* v. *Delaware River & Bay Auth.*, 471 F. Supp. 886, 891–892 (Del. 1979); *EEOC* v. *Florissant Valley Fire Protection Dist.*, 21 FEP Cases 973, 21 EPD ¶ 30,520 (ED Mo. 1979); *Remmick* v. *Barnes County*, 435 F. Supp. 914 (ND 1977); *Aaron* v. *Davis*, 424 F. Supp. 1238, 1239–1241 (ED Ark. 1976); *Usery* v. *Board of Education of Salt Lake City*, 421 F. Supp. 718 (Utah 1976).

Since the District Court decision in this case, two other District Court opinions have followed its lead, *Campbell* v. *Connelie*, 542 F. Supp. 275, 280 (NDNY 1982); *Taylor* v. *Montana Department of Fish & Game*, 523 F. Supp. 514, 515 (Mont. 1981), but at least two Court of Appeals and eight District Court opinions have declined to do so, see *EEOC* v. *County of Calumet*, 686 F. 2d 1249, 1251–1253 (CA7 1982); *EEOC* v. *Elrod*, 674 F. 2d 601, 603–612 (CA7 1982); *McCroan* v. *Bailey*, 543 F. Supp. 1201, 1205–1207 (SD Ga. 1982); *Kenny* v. *Valley County School District*, 543 F. Supp. 1194, 1196–1199 (Mont. 1982); *EEOC* v. *Minneapolis*, 537 F. Supp. 750, 756 (Minn. 1982); *Bleakley* v. *Jekyll Island—State Park Auth.*, 536 F. Supp. 236, 240 (SD Ga. 1982); *EEOC* v. *County of Los Angeles*, 531 F. Supp. 122, 124 (CD Cal. 1982); *EEOC* v. *County of Los Angeles*, 526 F. Supp. 1135, 1137–1138 (CD Cal. 1981); *Adams* v. *James*, 526 F. Supp. 80, 84 (MD Ala. 1981); *Johnson* v. *Mayor of Baltimore*, 515 F. Supp. 1287, 1292 (Md. 1981).

[7] Section 31–3–107 of the Wyoming State Highway Patrol and Game and Fish Warden Retirement Act, Wyo. Stat. § 31–3–107 (1977), provides that

complaint with the EEOC, alleging that the Game and Fish Department had violated the Age Discrimination in Employment Act. After conciliation efforts between the Commission and the Game and Fish Department failed, the Commission filed suit in the District Court for the District of Wyoming against the State and various of its officials seeking declaratory and injunctive relief, backpay, and liquidated damages on behalf of Mr. Crump and others similarly situated.

The District Court, upon a motion by the defendants, dismissed the suit. It held that the Age Discrimination in Employment Act violated the doctrine of Tenth Amendment immunity articulated in *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), at least insofar as it regulated Wyoming's employment relationship with its game wardens and other law enforcement officials. 514 F. Supp., at 600. The District Court also held, citing *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981), that the application of the ADEA to the States could not be justified as an exercise of Congress' power under § 5 of the Fourteenth Amendment because Congress did not explicitly state that it invoked that power in passing the 1974 amendments. 514 F. Supp., at 600.

### III

The appellees have not claimed either in the District Court or in this Court that Congress exceeded the scope of its affirmative grant of power under the Commerce Clause[8] in enacting the ADEA. See generally *National League of Cities* v. *Usery, supra,* at 840–841; *Heart of Atlanta Motel, Inc.* v.

---

"[a]n employee may continue in service on a year-to-year basis after age . . . fifty-five (55), with the approval of the employer and under conditions as the employer may prescribe." The provision also provides for the mandatory retirement of covered employees who reach the age of 65.

[8] "The Congress shall have power . . . [t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3.

*United States*, 379 U. S. 241, 243–244 (1964). Rather, the District Court held and appellees argue that, at least with respect to state game wardens, application of the ADEA to the States is precluded by virtue of external constraints imposed on Congress' commerce powers by the Tenth Amendment.

## A

*National League of Cities* v. *Usery* struck down Congress' attempt to extend the wage and hour provisions of the Fair Labor Standards Act to state and local governments. *National League of Cities* was grounded on a concern that the imposition of certain federal regulations on state governments might, if left unchecked, "allow 'the National Government [to] devour the essentials of state sovereignty,'" 426 U. S., at 855 (quoting *Maryland* v. *Wirtz*, 392 U. S. 183, 205 (1968) (Douglas, J., dissenting)). It therefore drew from the Tenth Amendment an "affirmative limitation on the exercise of [congressional power under the Commerce Clause] akin to other commerce power affirmative limitations contained in the Constitution." 426 U. S., at 841. The principle of immunity articulated in *National League of Cities* is a functional doctrine, however, whose ultimate purpose is not to create a sacred province of state autonomy, but to ensure that the unique benefits of a federal system in which the States enjoy a "'separate and independent existence,'" *id.*, at 845 (quoting *Lane County* v. *Oregon*, 7 Wall. 71, 76 (1869)), not be lost through undue federal interference in certain core state functions. See *FERC* v. *Mississippi*, 456 U. S. 742, 765–766 (1982); *United Transportation Union* v. *Long Island R. Co.*, 455 U. S. 678, 686–687 (1982); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 286–288 (1981).[9]

*Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra*, summarized the hurdles that confront any claim

---

[9] Cf. *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 489–490 (1939) (Frankfurter, J., concurring).

that a state or local governmental unit should be immune from an otherwise legitimate exercise of the federal power to regulate commerce:

> "[I]n order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of *National League of Cities* must satisfy *each* of three requirements. First, there must be a showing that the challenged statute regulates the 'States as States.' Second, the federal regulation must address matters that are indisputably 'attribute[s] of state sovereignty.' And third, it must be apparent that the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional governmental functions.'" 452 U. S., at 287–288 (citations omitted; emphasis in original).

Moreover,

> "Demonstrating that these three requirements are met does not . . . guarantee that a Tenth Amendment challenge to congressional commerce power action will succeed. There are situations in which the nature of the federal interest advanced may be such that it justifies state submission." *Id.*, at 288, n. 29 (citations omitted).

See also *United Transportation Union* v. *Long Island R. Co.*, *supra*, at 684, and n. 9. The first requirement—that the challenged federal statute regulate the "States as States"—is plainly met in this case.[10] The second requirement—that

---

[10] It is worth emphasizing, however, that it is precisely this prong of the *National League of Cities* test that marks it as a specialized immunity doctrine rather than a broad limitation on federal authority. As we made clear in *Hodel:*

"A wealth of precedent attests to congressional authority to displace or pre-empt state laws regulating *private* activity affecting interstate commerce when these laws conflict with federal law. . . . Although such congressional enactments obviously curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider im-

the federal statute address an "undoubted attribute of state sovereignty"—poses significantly more difficulties.[11]   We need not definitively resolve this issue, however, nor do we have any occasion to reach the final balancing step of the inquiry described in *Hodel*,[12] for we are convinced that, even if Wyoming's decision to impose forced retirement on

---

portant, the Supremacy Clause permits no other result." 452 U. S., at 290 (emphasis added; citations omitted).

See also *FERC* v. *Mississippi*, 456 U. S. 742, 759 (1982).

[11] *National League of Cities* held that "there are attributes of sovereignty attaching to every state government which may not be impaired by Congress" and that "[o]ne undoubted attribute of state sovereignty is the States' power to determine the wages which shall be paid to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where those employees may be called upon to work overtime." 426 U. S., at 845. Precisely what it meant by an "undoubted attribute of state sovereignty" is somewhat unclear, however, and our subsequent cases applying the *National League of Cities* test have had little occasion to amplify on our understanding of the concept.

A State's employment relationship with its workers can, under certain circumstances, be one vehicle for the exercise of its core sovereign functions.   In *National League of Cities*, for example, the power to determine the wages of government workers was tied, among other things, to the exercise of the States' public welfare interest in providing jobs to persons who would otherwise be unemployed, *id.*, at 848.   Moreover, some employment decisions are so clearly connected to the execution of underlying sovereign choices that they must be assimilated into them for purposes of the Tenth Amendment.   See *id.*, at 850 (relating power to determine hours of government workers to unimpeded exercise of State's role as provider of emergency services).   See generally *id.*, at 851 (stressing importance of state autonomy as to "*those* fundamental employment decisions *upon which their systems for performance of* [their dual functions of administering the public law and furnishing public services] *must rest*") (emphasis added).   But we are not to be understood to suggest that every state employment decision aimed simply at advancing a generalized interest in efficient management—even the efficient management of traditional state functions—should be considered to be an exercise of an "undoubted attribute of state sovereignty."

[12] See n. 17, *infra*.

its game wardens does involve the exercise of an attribute of state sovereignty, the Age Discrimination in Employment Act does not "directly impair" the State's ability to "structure integral operations in areas of traditional governmental functions."

B

The management of state parks is clearly a traditional state function. *National League of Cities*, 426 U. S., at 851. As we have already emphasized, however, the purpose of the doctrine of immunity articulated in *National League of Cities* was to protect States from federal intrusions that might threaten their "separate and independent existence." *Ibid.* Our decision as to whether the federal law at issue here directly impairs the States' ability to structure their integral operations must therefore depend, as it did in *National League of Cities* itself, on considerations of degree. See *id.*, at 845, 852; *FERC* v. *Mississippi*, 456 U. S., at 769–770. We conclude that the degree of federal intrusion in this case is sufficiently less serious than it was in *National League of Cities* so as to make it unnecessary for us to override Congress' express choice to extend its regulatory authority to the States.

In this case, appellees claim no substantial stake in their retirement policy other than "assur[ing] the physical preparedness of Wyoming game wardens to perform their duties." Brief for Appellees 18.[13] Under the ADEA, however, the State may still, at the very least, assess the fitness of its game wardens and dismiss those wardens whom it reasonably finds to be unfit. Put another way, the Act requires the State to achieve its goals in a more individualized and careful manner than would otherwise be the case, but it does not require the State to abandon those goals, or to abandon the public policy decisions underlying them. *FERC* v. *Mississippi, supra,* at 771; cf. n. 11, *supra.*

---

[13] The only other interest alluded to by appellees is in maintaining the integrity of the state pension system. See n. 15, *infra.*

Perhaps more important, appellees remain free under the ADEA to continue to do *precisely what they are doing now*, if they can demonstrate that age is a "bona fide occupational qualification" for the job of game warden. See *supra*, at 232–233. Thus, in distinct contrast to the situation in *National League of Cities*, *supra*, at 848, even the State's discretion to achieve its goals *in the way it thinks best* is not being overridden entirely, but is merely being tested against a reasonable federal standard.

Finally, the Court's concern in *National League of Cities* was not only with the effect of the federal regulatory scheme on the particular decisions it was purporting to regulate, but also with the potential impact of that scheme on the States' ability to structure operations and set priorities over a wide range of decisions. 426 U. S., at 849–850.[14] Indeed, *National League of Cities* spelled out in some detail how application of the federal wage and hour statute to the States threatened a virtual chain reaction of substantial and almost certainly unintended consequential effects on state decisionmaking. *Id.*, at 846–852. Nothing in this case, however, portends anything like the same wide-ranging and profound threat to the structure of state governance.

The most tangible consequential effect identified in *National League of Cities* was financial: forcing the States to pay their workers a minimum wage and an overtime rate would leave them with less money for other vital state programs. The test of such financial effect as drawn in *National League of Cities* does not depend, however, on "particularized assessments of actual impact," which may vary from State to State and time to time, but on a more generalized inquiry, essentially legal rather than factual, into the direct and obvious effect of the federal legislation on the ability of the States to allocate their resources. *Id.*, at 851–852; see

---

[14] We do not mean to suggest that such consequential effects could be enough, by themselves, to invalidate a federal statute. See *FERC* v. *Mississippi*, *supra*, at 770, n. 33; *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 292, n. 33 (1981).

*Hodel*, 452 U. S., at 292, n. 33. In this case, we cannot conclude from the nature of the ADEA that it will have either a direct or an obvious negative effect on state finances. Older workers with seniority may tend to get paid more than younger workers without seniority, and may by their continued employment accrue increased benefits when they do retire. But these increased costs, even if they were not largely speculative in their own right, might very well be outweighed by a number of other factors: Those same older workers, as long as they remain employed, will not have to be paid any pension benefits at all, and will continue to contribute to the pension fund. And, when they do retire, they will likely, as an actuarial matter, receive benefits for fewer years than workers who retire early.[15] Admittedly, as some of the *amici* point out, the costs of certain state health and other benefit plans would increase if they were automatically extended to older workers now forced to retire at an early age. But Congress, in passing the ADEA, included a provision specifically disclaiming a construction of the Act which would require that the health and similar benefits received by older work-

---

[15] Appellees argue that prohibiting involuntary retirement at age 55 will somehow interfere with the State's ability to "enable those law enforcement officers who, due to the rigors of their occupations, cannot work beyond 55 to retire with a maximum [pension] benefit." Brief for Appellees 12, n. 5. They do not, of course, suggest that anything in the Age Discrimination in Employment Act forbids the State to continue to provide maximum pension benefits to game wardens who retire at age 55. Rather, they claim that eliminating mandatory retirement will require the State to "balance [its pension] fund periodically based upon the number of employees who remained in service beyond 55," and that this would require "the complete restructuring of the benefit program." Frankly, we do not see how the State's financial ability to provide maximum benefits to game wardens who retire at age 55 would be anything but helped by eliminating the involuntary retirement of workers eligible to receive those maximum benefits. Cf. *National League of Cities* v. *Usery*, 426 U. S., at 853 (distinguishing Economic Stabilization Act from Fair Labor Standards Act on basis that former "operated to reduce the pressures upon state budgets rather than increase them").

ers be in all respects identical to those received by younger workers. ADEA § 4(f)(2), 29 U. S. C. § 623(f)(2) (1976 ed. and Supp. V).[16]

The second consequential effect identified in *National League of Cities* was on the States' ability to use their employment relationship with their citizens as a tool for pursuing social and economic policies beyond their immediate managerial goals. See, *e. g.*, 426 U. S., at 848 (offering jobs at below the minimum wage to persons who do not possess "minimum employment requirements"). Appellees, however, have claimed no such purposes for Wyoming's involuntary retirement statute. Moreover, whatever broader social or economic purposes could be imagined for this particular Wyoming statute would not, we are convinced, bring with them either the breadth or the importance of the state policies identified in *National League of Cities*.[17]

---

[16] The present version of § 4(f)(2) provides that

"[i]t shall not be unlawful for an employer . . . to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of [the] Act, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual [between the ages of 40 and 70] because of the age of such individual." (The last clause, relating to involuntary retirement, was added by the Age Discrimination in Employment Act Amendments of 1978, § 2(a), 92 Stat. 189.)

As Senator Jacob Javits explained in 1967, the meaning of this provision is that an employer is not compelled "to afford to older workers exactly the same pension, retirement, or insurance benefits as he affords to younger workers." 113 Cong. Rec. 31255 (1967), Legislative History 146. See H. R. Rep. No. 805, 90th Cong., 1st Sess., 4 (1967), Legislative History 77; 123 Cong. Rec. 34295 (1977) (remarks of Sen. Williams), Legislative History 482; 124 Cong. Rec. 8218–8219 (1978) (remarks of Sen. Javits), Legislative History 539–540.

[17] Even if the minimal character of the federal intrusion in this case did not lead us to hold that the ADEA survives the third prong of the *Hodel* inquiry, it might still, when measured against the well-defined federal in-

# IV

The extension of the ADEA to cover state and local governments, both on its face and as applied in this case, was a valid exercise of Congress' powers under the Commerce Clause. We need not decide whether it could also be upheld as an exercise of Congress' powers under §5 of the Fourteenth Amendment.[18] The judgment of the District Court is

terest in the legislation, require us to find that the nature of that interest "justifies state submission." We note, incidentally, that the strength of the federal interest underlying the Act is not negated by the fact that the Federal Government happens to impose mandatory retirement on a small class of its own workers. See Brief for Appellees 19. But cf. n. 5, *supra* (no upper age limit on Act's protection of federal employees). Once Congress has asserted a federal interest, and once it has asserted the strength of that interest, we have no warrant for reading into the ebbs and flows of political decisionmaking a conclusion that Congress was insincere in that declaration, and must from that point on evaluate the sufficiency of the federal interest as a matter of law rather than of psychological analysis.

[18] We do reaffirm that when properly exercising its power under §5, Congress is not limited by the same Tenth Amendment constraints that circumscribe the exercise of its Commerce Clause powers. *City of Rome* v. *United States*, 446 U. S. 156, 179 (1980). We also note that, whatever else may be said about the §5 question in this case, the District Court erred in reading *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981), as holding that congressional action could not be upheld on the basis of §5 unless Congress "expressly articulated its intent to legislate under §5," and in disposing of the §5 argument on the sole basis that "nothing in the 1974 . . . Amendments [to the ADEA] or their legislative history . . . suggest[s] that Congress acted pursuant to any other power than the Commerce Clause," 514 F. Supp. 595, 600 (1981).

It is in the nature of our review of congressional legislation defended on the basis of Congress' powers under §5 of the Fourteenth Amendment that we be able to discern some legislative purpose or factual predicate that supports the exercise of that power. That does not mean, however, that Congress need anywhere recite the words "section 5" or "Fourteenth Amendment" or "equal protection," see, *e. g.*, *Fullilove* v. *Klutznick*, 448 U. S. 448, 476–478 (1980) (BURGER, C. J.), for "[t]he . . . constitutionality of action taken by Congress does not depend on recitals of the power which

reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, concurring.

While I join the Court's opinion, a complete explanation of my appraisal of the case requires these additional comments about the larger perspective in which I view the underlying issues.

I

In final analysis, we are construing the scope of the power granted to Congress by the Commerce Clause of the Constitution. It is important to remember that this Clause was the Framers' response to the central problem that gave rise to the Constitution itself. As I have previously noted, Justice Rutledge described the origins and purpose of the Commerce Clause in these words:

"If any liberties may be held more basic than others, they are the great and indispensable democratic freedoms secured by the First Amendment. But it was not

it undertakes to exercise." *Woods* v. *Cloyd W. Miller Co.,* 333 U. S. 138, 144 (1948).

Our task in *Pennhurst State School and Hospital* v. *Halderman, supra,* was to construe a statute, 451 U. S., at 15, not to adjudge its constitutional validity, see *id.,* at 16, n. 12. The Court characterized the question before it as whether "Congress intend[ed a certain statute] to create enforceable rights and obligations." *Id.,* at 15. It then made the unremarkable statement, relied on by the District Court, that "we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Id.,* at 16. The rule of statutory construction invoked in *Pennhurst* was, like all rules of statutory construction, a tool with which to divine the meaning of otherwise ambiguous statutory intent. Here, there is no doubt what the intent of Congress was: to extend the application of the ADEA to the States. The observations in *Pennhurst* therefore simply have no relevance to the question of whether, in this case, Congress acted pursuant to its powers under § 5.

to assure them that the Constitution was framed and adopted. Only later were they added, by popular demand. It was rather to secure freedom of trade, to break down the barriers to its free flow, that the Annapolis Convention was called, only to adjourn with a view to Philadelphia. Thus the generating source of the Constitution lay in the rising volume of restraints upon commerce which the Confederation could not check. These were the proximate cause of our national existence down to today.

"As evils are wont to do, they dictated the character and scope of their own remedy. This lay specifically in the commerce clause. No prohibition of trade barriers as among the states could have been effective of its own force or by trade agreements. It had become apparent that such treaties were too difficult to negotiate and the process of securing them was too complex for this method to give the needed relief. Power adequate to make and enforce the prohibition was required. Hence, the necessity for creating an entirely new scheme of government.

". . . So by a stroke as bold as it proved successful, they founded a nation, although they had set out only to find a way to reduce trade restrictions. So also they solved the particular problem causative of their historic action, by introducing the commerce clause in the new structure of power." W. Rutledge, A Declaration of Legal Faith 25–26 (1947), quoted in *United States* v. *Stasczuk*, 517 F. 2d 53, 58 (CA7) (en banc), cert. denied, 423 U. S. 837 (1975).[1]

---

[1] Justice Rutledge's view of our Nation's history has been widely shared. For example, in 1934 in an article in the Harvard Law Review, Robert L. Stern wrote:

"The Constitutional Convention was called because the Articles of Confederation had not given the Federal Government any power to regulate commerce. This defect proved to be so serious that the Virginia General Assembly appointed commissioners to meet with commissioners of other

There have been occasions when the Court has given a miserly construction to the Commerce Clause.[2]   But as the needs of a dynamic and constantly expanding national economy have changed, this Court has construed the Commerce Clause to reflect the intent of the Framers of the Constitution—to confer a power on the National Government ade-

---

states to 'take into consideration the trade of the United States; to examine the relative situation and trade of the said states; to consider how far the uniform system in their commercial regulations may be necessary to their common interest and their permanent harmony; and to report to the several states such an act relative to this great object. . . .'   Representatives of but five states met at Annapolis in September, 1786.   They determined that they could do nothing by themselves, and that the adequate protection of commerce required a complete revision of the structure of government. Accordingly, they recommended that a convention be called for the purpose of revising the Articles of Confederation, and Congress thereupon asked the various states to send delegates to Philadelphia in May, 1787.

.         .         .         .         .

". . . In view of the fact that the need for centralized commercial regulation was universally recognized as the primary reason for preparing a new constitution, the Convention would not have been likely to have meant the commerce clause to have a narrow or restrictive meaning."   Stern, That Commerce Which Concerns More States Than One, 47 Harv. L. Rev. 1335, 1337, 1340–1341 (1934) (footnotes omitted).

See also 1 A. Beveridge, The Life of John Marshall 310–312 (1916); G. Gunther, Constitutional Law 127 (9th ed. 1975) ("The poor condition of American commerce and the proliferating trade rivalries between the states were the immediate provocations for the calling of the Constitutional Convention"); C. Swisher, American Constitutional Development 25–27 (2d ed. 1954); *Gibbons* v. *Ogden*, 9 Wheat. 1, 224 (1824) (opinion of Johnson, J.) (the "conflict of commercial regulations, destructive to the harmony of the States . . . was the immediate cause, that led to the forming of a convention").

[2] See, *e. g.*, *Kidd* v. *Pearson*, 128 U. S. 1, 20–21 (1888) (manufacturing is not subject to the commerce power of Congress); *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12–16 (1895) (monopoly in manufacturing is not subject to the commerce power); *Adair* v. *United States*, 208 U. S. 161, 178–179 (1908) (connection between interstate commerce and membership in a labor union insufficient to authorize Congress to make it a crime for an interstate carrier to discharge an employee because of union membership); *Hammer* v. *Dagenhart*, 247 U. S. 251, 276 (1918) (Congress has no power

quate to discharge its central mission. In this process the Court has repeatedly repudiated cases that had narrowly construed the Clause.[3] The development of judicial doctrine has accommodated the transition from a purely local, to a regional, and ultimately to a national economy.[4] Today, of course, our economy is merely a part of an international mechanism no single nation could possibly regulate.

In the statutes challenged in this case and in *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), Congress exercised its power to regulate the American labor market. There was a time when this Court would have denied that Congress had any such power,[5] but that chapter in our judi-

---

to prohibit interstate transportation of goods produced with child labor); *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 308–310 (1936) (commerce power does not extend to regulation of wages, hours, and working conditions of coal miners).

[3] Compare *Stafford* v. *Wallace*, 258 U. S. 495, 524–525 (1922), with *Hopkins* v. *United States*, 171 U. S. 578, 592–598 (1898); *Virginian R. Co.* v. *Railway Employees*, 300 U. S. 515, 557 (1937), with *Employers' Liability Cases*, 207 U. S. 463, 498 (1908); *Sunshine Coal Co.* v. *Adkins*, 310 U. S. 381, 393–394 (1940), with *Carter* v. *Carter Coal Co.*, supra, at 297–310; *United States* v. *Darby*, 312 U. S. 100, 115–117 (1941), with *Hammer* v. *Dagenhart*, supra, at 269–277; *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 542–553 (1944), with *New York Life Insurance Co.* v. *Deer Lodge County*, 231 U. S. 495, 502–512 (1913); *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S. 219, 229–235 (1948), with *United States* v. *E. C. Knight Co.*, supra, at 12–16.

[4] See, e. g., *Wickard* v. *Filburn*, 317 U. S. 111, 118–125 (1942) (Congress may constitutionally apply wheat marketing quota to wheat grown wholly for consumption on the farm, because of interdependence of national market); *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, supra, at 229–235 (Congress has power under Commerce Clause to prohibit price fixing by purchasers of beet sugar from growers in same State); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 249–262 (1964) (Congress may prohibit racial discrimination in places of public accommodation affecting commerce); *Perez* v. *United States*, 402 U. S. 146, 154–155 (1971) (Commerce Clause gives Congress power to regulate local loan sharking because it is in a class of activities that has an impact on interstate commerce).

[5] See, e. g., *Employers' Liability Cases*, supra, at 496–499; *Adair* v. *United States*, supra, at 176–180; *Hammer* v. *Dagenhart*, supra, at 271–275; *Carter* v. *Carter Coal Co.*, supra, at 303–304.

cial history has long been closed.[6]   Today, there should be universal agreement on the proposition that Congress has ample power to regulate the terms and conditions of employment throughout the economy.   Because of the interdependence of the segments of the economy and the importance and magnitude of government employment, a comprehensive congressional policy to regulate the labor market may require coverage of both public and private sectors to be effective.

Congress may not, of course, transcend specific limitations on its exercise of the commerce power that are imposed by other provisions of the Constitution.   But there is no limitation in the text of the Constitution that is even arguably applicable to this case.   The only basis for questioning the federal statute at issue here is the pure judicial fiat found in this Court's opinion in *National League of Cities* v. *Usery*.   Neither the Tenth Amendment,[7] nor any other provision of the Constitution, affords any support for that judicially constructed limitation on the scope of the federal power granted to Congress by the Commerce Clause.[8]   In my opinion, that

---

[6] See *United States* v. *Darby, supra,* at 113–124.

[7] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."   U. S. Const., Amdt. 10.

As Chief Justice Stone wrote in *United States* v. *Darby, supra,* at 124: "The amendment states but a truism that all is retained which has not been surrendered. . . . From the beginning and for many years the amendment has been construed as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end."

[8] This, of course, is not an original observation.   See Chief Justice Marshall's opinion for the Court in *Gibbons* v. *Ogden, supra,* at 196–197:

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed.   This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution.   These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar.   If, as has always been understood, the sovereignty of congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign na-

decision must be placed in the same category as *United States* v. *E. C. Knight Co.*, 156 U. S. 1 (1895), *Hammer* v. *Dagenhart*, 247 U. S. 251 (1918), and *Carter* v. *Carter Coal Co.*, 298 U. S. 238 (1936)—cases whose subsequent rejection is now universally regarded as proper. I think it so plain that *National League of Cities* not only was incorrectly decided, but also is inconsistent with the central purpose of the Constitution itself, that it is not entitled to the deference that

---

tions, and among the several States, is vested in congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, . . . the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments."

These words carry special weight in view of the fact that, more than 35 years earlier, Chief Justice Marshall had been a delegate at the Virginia ratifying convention and had participated in the crucial debates regarding the proposed Constitution. He was thus fully conscious of the dramatic contrast between the Articles of Confederation, which had declared explicitly that "[e]ach State retains its sovereignty, freedom, and independence," Art. 2, and the new Constitution, which contained not a word respecting the sovereignty, freedom, and independence of the States, but rather conveyed an unequivocal message in the Supremacy Clause, Art. VI, cl. 2. The role of the States in the Confederation was repeatedly contrasted with their role in the proposed Constitution, both by supporters and by opponents of ratification. See 3 J. Elliot, Debates on the Federal Constitution 129 (1891 ed.) (James Madison, speaking in support: "A government which relies on thirteen independent sovereignties for the means of its existence, is a solecism in theory and a mere nullity in practice. . . . The effect, sir, cannot be changed without a removal of the cause"); *id.*, at 22 (Patrick Henry, speaking in opposition: "Who authorized them to speak the language of, *We, the people*, instead of, *We, the states?* States are the characteristics and the soul of a confederation. If the states be not the agents of this compact, it must be one great, consolidated, national government, of the people of all the states"). The question of authority, of course, was resolved by the ratification.

the doctrine of *stare decisis* ordinarily commands for this Court's precedents. Notwithstanding my respect for that doctrine, I believe that the law would be well served by a prompt rejection of *National League of Cities'* modern embodiment of the spirit of the Articles of Confederation.

## II

My conviction that Congress had ample power to enact this statute, as well as the statute at issue in *National League of Cities*, is unrelated to my views about the merits of either piece of legislation. As I intimated in my dissent in that case, I believe that federal regulation that enhances the minimum price of labor inevitably reduces the number of jobs available to people who are ready, willing, and able to engage in productive work—and thereby aggravates rather than ameliorates our unemployment problems. I also believe, contrary to the popular view, that the burdens imposed on the national economy by legislative prohibitions against mandatory retirement on account of age exceed the potential benefits. My personal views on such matters are, however, totally irrelevant to the judicial task I am obligated to perform. There is nothing novel about this point—it has been made repeatedly by more learned and more experienced judges.[9] But it is important to emphasize this obvious limit on the proper exercise of judicial power, one that is sometimes overlooked by those who criticize our work product.

The question in this case is purely one of constitutional power. In exercising its power to regulate the national market for the services of individuals—either by prescribing the minimum price for such services or by prohibiting employment discrimination on account of age—may Congress regulate both the public sector and the private sector of that mar-

---

[9] See, *e. g.*, *Spencer* v. *Texas*, 385 U. S. 554, 569 (1967) (Stewart, J., concurring); *Adair* v. *United States*, 208 U. S., at 191–192 (Holmes, J., dissenting); *Lochner* v. *New York*, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting).

ket, or must it confine its regulation to the private sector? If the power is to be adequate to enable the National Government to perform its central mission, that question can have only one answer.

CHIEF JUSTICE BURGER, with whom JUSTICE POWELL, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

The Court decides today that Congress may dictate to the states, and their political subdivisions, detailed standards governing the selection of state employees, including those charged with protecting people and homes from crimes and fires. Although the opinion reads the Constitution to allow Congress to usurp this fundamental state function, I have reexamined that document and I fail to see where it grants to the National Government the power to impose such strictures on the states either expressly or by implication. Those strictures are not required by any holding of this Court, and it is not wholly without significance that Congress has not placed similar limits on itself in the exercise of its own sovereign powers. Accordingly, I would hold the Age Discrimination in Employment Act (Age Act) unconstitutional as applied to the states, and affirm the judgment of the District Court.

I

I begin by analyzing the Commerce Clause rationale, for it was upon this power that Congress expressly relied when it originally enacted the Age Act in 1967, see 29 U. S. C. § 621, and when it extended its protections to state and local government employees, see H. R. Rep. No. 93–913, pp. 1–2 (1974).[1]

---

[1] The Age Act was extended to the states along with the Fair Labor Standards Act. Pub. L. 93–259, § 28, 88 Stat. 74. Extension of the FLSA was declared unconstitutional in *National League of Cities* v. *Usery*, 426 U. S. 833 (1976).

We have had several occasions in recent years to investigate the scope of congressional authority to legislate under the Commerce Clause, see, *e. g.*, *National League of Cities* v. *Usery*, 426 U. S. 833 (1976); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264 (1981); *United Transportation Union* v. *Long Island R. Co.*, 455 U. S. 678 (1982). The wisdom to be drawn from these cases is that Congress' authority under the Commerce Clause is restricted by the protections afforded the states by the Tenth Amendment. To decide whether a particular enactment has improperly intruded into Tenth Amendment rights, we have adopted a three-prong test:

> "First, there must be a showing that the challenged statute regulates the 'States as States.' [*National League of Cities*, 426 U. S.], at 854. Second, the federal regulation must address matters that are indisputably 'attribute[s] of state sovereignty.' *Id.*, at 845. And third, it must be apparent that the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional governmental functions.' *Id.*, at 852." *Hodel*, 452 U. S., at 287–288.

For statutes that meet each prong of this test, a final inquiry must be made to decide whether "the federal interest advanced [is] such that it justifies state submission." *Id.*, at 288, n. 29, citing *Fry* v. *United States*, 421 U. S. 542 (1975); *National League of Cities, supra*, at 856 (BLACKMUN, J., concurring).

We need not pause on the first prong of this test, for the legislation is indisputably aimed at regulating the states in their capacity as states, 29 U. S. C. § 630(b). The Commission argues, however, that the legislation does not run counter to the other two prongs of the test. Turning then to prong two, whether the Age Act addresses matters that are "attributes of state sovereignty," we may assume that in enacting the Wyoming State Highway Patrol and Game and

Fish Warden Retirement Act, Wyo. Stat. § 31–3–101 *et seq.* (1977 and Supp. 1982), Wyoming sought to assure the physical preparedness of its game wardens and others who enforce its laws. Tr. of Oral Arg. 5. This goal is surely an attribute of sovereignty, for parks and recreation services were identified in *National League of Cities, supra,* at 851, as traditional state activities protected by the Tenth Amendment. Even more important, it is the essence of state power to choose— subject only to *constitutional* limits—who is to be part of the state government. Cf. *Oregon* v. *Mitchell,* 400 U. S. 112, 123 (1970) (Black, J.). If poachers destroy the fish and game reserves of Wyoming, it is not to the Congress that people are going to complain, but to state and local authorities who will have to justify their actions in selecting wardens. Since it is the State that bears the responsibility for delivering the services, it is clearly an attribute of state sovereignty to choose who will perform these duties.

To decide whether a challenged activity is an attribute of sovereignty, it is instructive to inquire whether other government entities have attempted to enact similar legislation. A finding that other governmental units have passed mandatory retirement laws, although not conclusive, is persuasive evidence that such laws are traditional methods for insuring an efficient work force for certain governmental functions. My research indicates that more than one-half the states have retirement laws that, like the Wyoming State Highway Patrol and Game and Fish Warden Retirement Act, violate the Age Act.[2] More important, Congress, while mandating

[2] See, *e. g.,* Ala. Code § 36–27–16(a)(1)(e) (Supp. 1982) (police; age 60); Ark. Stat. Ann. § 42–455 (1977) (police; 65); Cal. Gov't Code Ann. § 20980 (West 1980) (highway patrol; 60); Del. Code Ann., Tit. 11, § 8323 (1979) (police; 55); Idaho Code § 50–1514(a) (Supp. 1981) (police; 65); Ill. Rev. Stat., ch. 24, ¶ 10–2.1–17 (1979) (police and firemen; 65); Ind. Code § 36–8–3.5–20 (1981) (police and firemen; 65); Iowa Code § 97B.46(3) (Supp. 1982–1983) (peace officers and firefighters; 65); Kan. Stat. Ann. § 74–4975(b) (1980) (patrolmen; 60); La. Rev. Stat. Ann. § 42–691 (West Supp. 1983) (law enforcement personnel and firefighters; 65); Md. Ann. Code,

compliance in the states, carefully preserved its own freedom to select employees on any basis it chooses. Although the Age Act was expressly made to apply to the National Government, 29 U. S. C. § 633a (1976 ed. and Supp. V), exceptions were built into the enactment. Certain categories of federal employment—such as law enforcement officers—were *explicitly* excluded, and in addition, the statute provides that "[r]easonable exemptions to the provisions of this section may be established by the [Civil Service] Commission."[3] 29 U. S. C. § 633a(b). I conclude that defining the qualifications of employees is an essential of sovereignty.

---

Art. 88B, § 53(1)(c) (1979) (police; 60); Mass. Gen. Laws Ann., ch. 32, § 69(d) (West 1966) and § 83A(d) (Supp. 1982–1983) (police; 65); Mich. Comp. Laws Ann. § 38.556(1)(c) (Supp. 1982) (police and firemen; 65); Minn. Stat. § 423.075(1) (Supp. 1983) (police and firemen; 65); Miss. Code Ann. § 25–13–11 (Supp. 1982) (highway patrol; 55) and § 21–29–245 (Supp. 1982) (police and firemen; 60); Mo. Ann. Stat. § 104.010 and § 104.080 (Vernon Supp. 1983) (highway patrol; 60); Mont. Code Ann. § 19–6–504 (1981) (highway patrol; 60) and § 19–9–801 (1981) (police; 65); Neb. Rev. Stat. § 81–2025(2) (1981) (patrolmen; 60); N. Y. Retire. & Soc. Sec. Law § 381–b(e) (McKinney Supp. 1982–1983) (police; 65); N. D. Cent. Code § 39–03.1–18 (1980) (highway patrol; 60); Ohio Rev. Code Ann. § 5505.16 (Supp. 1982) (highway patrol; 55); Okla. Stat., Tit. 47, § 2–305A (Supp. 1982–1983) (police; 60); Ore. Rev. Stat. § 237.129(1) (1981) (police and firemen; 60); Pa. Stat. Ann., Tit. 71, § 65(d) (Purdon Supp. 1982–1983) (police; 60); R. I. Gen. Laws § 45–21.2–5 (1980) (police and firemen; 65); S. C. Code § 9–1–1535 (Supp. 1982) (conservation officers; 65); Tenn. Code Ann. § 8–36–205(1) (1980) (police; 60 or 65); Tex. Rev. Civ. Stat. Ann., Art. 6423g–1, § 11(d) (Vernon Supp. 1982–1983) (police; 65); Vt. Stat. Ann., Tit. 3, § 459(a)(2) (Supp. 1982) (police; 55); Wash. Rev. Code § 43.43.250(1) (1981) (state patrol; 60); W. Va. Code § 8–22–25(d) (Supp. 1982) (police and firemen; 65); Wis. Stat. § 41.02(23) (1979–1980) (police and firemen; 55); Wyo. Stat. § 15–5–307(a) (Supp. 1982) (police; 60). See also App. to Brief for National Institute of Municipal Law Enforcement Officers as *Amicus Curiae* 1a–7a, citing 160 municipalities that have laws violating the Age Act.

[3] This function was later transferred to the Equal Employment Opportunity Commission, see § 2 of the Reorg. Plan No. 1 of 1978, 3 CFR 321 (1979), 92 Stat. 3781, 5 U. S. C. App. 426 (1976 ed., Supp. V).

The third prong of the *National League of Cities* test is that the federal intrusion must impair the ability of the state to structure integral operations. Wyoming cites several ways in which the Age Act interferes with its ability to structure state services, and several *amici* inform us of additional difficulties, some economic, some not, that are engendered by the Act.

It is beyond dispute that the statute can give rise to increased employment costs caused by forced employment of older individuals. Since these employees tend to be at the upper end of the pay scale, the cost of their wages while they are still in the work force is greater. And since most pension plans calculate retirement benefits on the basis of maximum salary or number of years of service, pension costs are greater when an older employee retires.[4] The employer is also forced to pay more for insuring the health of older employees because, as a group, they inevitably carry a higher-than-average risk of illness. See, *e. g.*, Pollock, Gettman, & Meyer, Analysis of Physical Fitness and Coronary Heart Disease Risk of Dallas Area Police Officers, 20 J. Occup. Med. 393 (1978); N. Shock, Cardiac Performance and Age, in Cardiovascular Problems, Perspectives and Progress 3–24 (H. Russek ed. 1976); J. Hall & J. Zwemer, Prospective Medicine (2d ed. 1979). Since they are—especially in law enforce-

---

[4] This problem is exacerbated by the special retirement schemes often used in connection with mandatory early retirement laws. In Wyoming, for example, state employees who are not subject to early retirement contribute less per month towards retirement than those in occupations where early retirement is required. So long as the early retirement laws are in effect, this system is actuarially sound because the employees who will spend less years at work pay into the system more rapidly. Simple invalidation of the early retirement system would work an inequity by requiring these workers to contribute more towards retirement than other state employees. Brief for Appellees 12, n. 5. Of course, Wyoming could revamp its pension system to correct this problem. Forcing the State to do so is another example of the adverse impact wrought by the Age Act.

ment—also more prone to on-the-job injuries, it is reasonable to conclude that the employer's disability costs are increased. See generally, D. Gregg & V. Lucas, Life and Health Insurance Handbook (3d ed. 1973); S. Huebner & K. Black, Life Insurance (10th ed. 1982).

Noneconomic hardships are equally severe. Employers are prevented from hiring those physically best able to do the job. Since older workers occupy a disproportionate share of the upper-level and supervisory positions, a bar on mandatory retirement also impedes promotion opportunities. Lack of such opportunities tends to undermine younger employees' incentive to strive for excellence, and impedes the state from fulfilling affirmative-action objectives.

The Federal Government can hardly claim that the objectives of decreasing costs and increasing promotional opportunities are impermissible: many of the same goals are cited repeatedly to justify the "enclaves" of federal exceptions to the Age Act. For example, mandatory retirement is still the rule in the Armed Services, 10 U. S. C. § 1251 (1976 ed., Supp. V), and the Foreign Service, 22 U. S. C. § 4052 (1976 ed., Supp. V), despite passage of the Age Act. The House Committee on Armed Services continues, apparently, to think it essential to have a mechanism to assure that officers from positions of command are vigorous and free from infirmities generally associated with age. H. R. Rep. No. 96–1462, p. 8 (1980). Similarly, the House Committee on Post Office and Civil Service, while acknowledging the "unfairness of a mandatory retirement age," H. R. Rep. No. 96–992, pt. 2, p. 30 (1980), concluded that it remains necessary in the Foreign Service "for the maintenance of predictable career patterns," ibid., to prevent "unavailability for worldwide assignment," ibid., and to "restore the 'flow' [i. e., promotional opportunities] to the system," id., at 15. See also 5 U. S. C. § 335. It is difficult to grasp just how Congress reconciles that view with its legislation forcing the states to comply with rigid standards.

The Commission answers the State's contentions by arguing that even under the Age Act, it is possible to effectuate some of the State's goals. According to appellant, adverse economic impact is mitigated by 29 U. S. C. § 623(f)(2) (1976 ed., Supp. V), which provides that an employer may "observe the terms of a bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter . . . ."

I reject the notion that this exception ameliorates the State's problem to any significant extent. The reality is that, for Wyoming to benefit from this exception, it will have to enact new laws and develop new regulations to reduce its insurance coverage on older employees. Drafting and enacting these new laws is a burden Congress has no power to impose on the states. Second, it is doubtful that Wyoming could, as a practical matter, lower the health and disability insurance coverage on employees who fall under mandatory retirement laws. It is these employees who are, for the most part, in the most physically hazardous occupations, and thus most need protection. Stated another way, perhaps Crump would not want to keep his job if the State were unwilling to bear the economic risks of his injuries. Section 623(f)(2) is thus a shallow alternative to mandatory retirement.

Section 623(f)(1), the Commission's answer to the problem of protecting the State's ability to deliver its services effectively, provides no solution either. That section provides that mandatory early retirement is permissible "where age is a bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation of the particular business . . . ." Although superficially, this section appears to offer the states a means for lessening the administrative burden of retiring unfit employees on a case-by-case basis, the exception does not work in practice. In the absence of statutory guidelines, the courts that have faced the question have—in response to this appellant's urgings—established a

high standard of what constitutes a bona fide occupational qualification. Typical seems to be the approach taken in *Arritt* v. *Grisell*, 567 F. 2d 1267, 1271 (CA4 1977), requiring the employer to prove

> "(1) that the bfoq which it invokes is reasonably necessary to the essence of its business . . . , and (2) that the employer has reasonable cause, i. e., a factual basis for believing that all or substantially all persons within the class . . . would be unable to perform safely and efficiently the duties of the job involved, or that it is impossible or impractical to deal with persons over the age limit on an individualized basis."

See also *Usery* v. *Tamiami Trail Tours, Inc.*, 531 F. 2d 224 (CA5 1976). Given the state of modern medicine, it is virtually impossible to prove that *all* persons within a class are unable to perform a particular job or that it is impossible to test employees on an individual basis, see, *e. g., Johnson* v. *Mayor of Baltimore*, 515 F. Supp. 1287, 1299 (Md. 1981), cert. denied, 455 U. S. 944 (1982).

In the face of this track record, I find it impossible to say that § 623(f)(1) provides an adequate method for avoiding significant impairment to the state's ability to structure its integral governmental operations.[5]

Since I am satisfied that the Age Act runs afoul of the three prongs of the *National League of Cities* test, I turn to the balancing test alluded to in JUSTICE BLACKMUN's concurring opinion in *National League of Cities*, and in *Hodel*. The Commission argues that the federal interest in preventing unnecessary demands on the social security system and other maintenance programs, in protecting employees from arbitrary discrimination, and in eliminating unnecessary burdens on the free flow of commerce "is more than sufficient in the

---

[5] In addition, states that choose to invoke the BFOQ exception expose themselves to lawsuits requiring them to defend their choices. Defense of lawsuits is a costly and time-consuming endeavor that is, in itself, a burden impermissible for Congress to impose on the states.

face of . . . Wyoming's bald assertion of a prerogative to be arbitrary." Brief for Appellant 19.

It is simply not accurate to state that Wyoming is resting its challenge to the Age Act on a "sovereign" right to discriminate; as I read it, Wyoming is asserting a right to set standards to meet local needs. Nor do I believe that these largely theoretical benefits to the Federal Government outweigh the very real danger that a fire may burn out of control because the firefighters are not physically able to cope; or that a criminal may escape because a law enforcement officer's reflexes are too slow to react swiftly enough to apprehend an offender; or that an officer may be injured or killed for want of capacity to defend himself. These factors may not be real to Congress but it is not Congress' responsibility to prevent them; they are nonetheless real to the states. I would hold that Commerce Clause powers are wholly insufficient to bar the states from dealing with or preventing these dangers in a rational manner. Wyoming's solution is plainly a rational means.

## II

Since it was ratified after the Tenth Amendment, the Fourteenth Amendment is not subject to the constraints discussed earlier in connection with the Commerce Clause. Indeed, it is well established that Congress may, under the powers bestowed by § 5, enact legislation affecting the states, *Ex parte Virginia*, 100 U. S. 339, 345 (1880); *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976). But this does not mean that Congress has been given a "blank check" to intrude into details of states' governments at will. The Tenth Amendment was not, after all, repealed when the Fourteenth Amendment was ratified: it was merely limited. The question then becomes whether the Fourteenth Amendment operates to transfer from the states to the Federal Government the essentially local governmental function of deciding who will protect citizens from lawbreakers.

The outer reaches of congressional power under the Civil War Amendments have always been uncertain. One factor

is, however, clear: Congress may act only where a violation lurks. The flaw in the Commission's analysis is that in this instance, no one—not the Court, not the Congress[6]—has determined that mandatory retirement plans violate any rights protected by these Amendments. We cannot say that the Judiciary made this determination, for we have considered the constitutionality of mandatory retirement schemes twice, in *Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307 (1976), for state police, and *Vance* v. *Bradley*, 440 U. S. 93 (1979), for Foreign Service officers; we rejected both equal protection challenges. In both instances, we arrived at our conclusion by examining, *arguendo*, the retirement schemes under the rational-basis standard. It was not necessary that we be convinced that equal protection guarantees extend to classes defined by age because governmental employment is not a fundamental right and those who are mandatorily retired are not a suspect class.

In *Murgia*, we found that early retirement of policemen was justified by the states' objective of "protect[ing] the public by assuring physical preparedness of its uniformed police," 427 U. S., at 314; in *Bradley*, we held that early retirement of Foreign Service personnel was justified by Congress' perception of a need to assure "opportunities for promotion would be available" and "the high quality of those occupying positions critical to the conduct of our foreign relations," and in order to "minimiz[e] the risk of less than superior performance by reason of poor health or loss of vitality," 440 U. S., at 101 and 103–104. Congress was simply using a rational means for solving a practical governmental problem within its constitutional jurisdiction.

Were we asked to review the constitutionality of the Wyoming State Highway Patrol and Game and Fish Warden Re-

---

[6] The ability of Congress to define independently protected classes is an issue that need not be resolved here because I think that the Age Act is unconstitutional even if it is assumed that Congress has this power.

tirement Act, we would reach a result consistent with *Bradley* and *Murgia*. Like Congress dealing with military personnel, FBI agents, and Foreign Service officers, the State of Wyoming has an interest in the physical ability of its highway patrol and game and fish wardens. It is within Wyoming's authority to motivate personnel to high performance by assuring opportunities for advancement; Wyoming reasonably considers safety conditions on its highways and game preserves critical to the well-being of its citizenry. In short, it cannot be said that in applying the Age Act to the states Congress has acted to enforce equal protection guarantees as they have been defined by this Court.

Nor can appellant claim that Congress has used the powers we recognized in *City of Rome* v. *United States*, 446 U. S. 156, 176–177 (1980); *Oregon* v. *Mitchell*, 400 U. S. 112 (1970); *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 437–444 (1968); *South Carolina* v. *Katzenbach*, 383 U. S. 301 (1966); and *Katzenbach* v. *Morgan*, 384 U. S. 641 (1966), to enact legislation that prohibits conduct not in itself unconstitutional because it considered the prohibition necessary to guard against encroachment of guaranteed rights or to rectify past discrimination. There has been no finding, as there was in *South Carolina* v. *Katzenbach*, *supra*, at 309, that the abrogated state law infringed on rights identified by this Court.[7]

---

[7] At oral argument, the Solicitor General argued that in applying the rational-basis test in *Murgia* and *Bradley*, the Court *sub silentio* agreed that age discrimination is protected by the Equal Protection Clause, and that Congress has merely altered the burden needed to prove compliance with its guarantees. Tr. of Oral Arg. 17–18. I do not read these decisions to support this notion. *Murgia* and *Bradley* presented us with no occasion to determine the scope of the equal protection guarantee because we found the legislation challenged there sustainable even if we assumed the class was protected.

This is not to say definitively that age discrimination is not protected by the Fourteenth Amendment because this case does not squarely raise that issue. Rather, I am pointing out that since this Court has not decided the

Nor did Congress use, as it did in *Katzenbach* v. *Morgan,* *supra,* at 656, its "specially informed legislative competence" to decide that the state law it invalidated was too intrusive on federal rights to be an appropriate means to achieve the ends sought by the state. Instead, the Age Act can be sustained only if we assume first, that Congress can define rights wholly independently of our case law, and second, that Congress has done so here. I agree with neither proposition.

Allowing Congress to protect constitutional rights statutorily that it has independently defined fundamentally alters our scheme of government. Although the *South Carolina* v. *Katzenbach* line of cases may be read to allow Congress a degree of flexibility in deciding what the Fourteenth Amendment safeguards, I have always read *Oregon* v. *Mitchell* as finally imposing a limitation on the extent to which Congress may substitute its own judgment for that of the states and assume this Court's "role of final arbiter," *Mitchell, supra,* at 205 (Harlan, J., concurring in part and dissenting in part). *Mitchell,* after all, involved legislation in the area of suffrage, where Congress had special competence and special reasons to limit the powers of the states. It is significant, however, that while we there sustained the portions of the Voting Rights Act Amendments of 1970 lowering the minimum age of voters from 21 to 18 in federal elections, barring literacy tests in state and federal elections, and prohibiting states from disqualifying voters in Presidential elections for failure to meet state residency requirements, a majority of the *Mitchell* Court did not agree to allow Congress to alter voting requirements in *state* elections. We struck that portion of the Voting Rights Act because we thought it a "plain fact of history" that Congress lacked this power, see 400 U. S., at 125 and 294 (Black and Stewart, JJ.); *id.,* at 154–215 (Harlan, J.); and because we thought that the Fourteenth Amendment

question, the Government cannot support this enactment on the ground that Congress was attempting to establish further safeguards for a class we have found to be constitutionally protected.

was not a license to "overstep the letter or spirit of any constitutional restriction," *id.*, at 287 (Stewart, J.).

For me, this same reasoning leads inevitably to the conclusion that Congress lacked power to apply the Age Act to the states. There is no hint in the body of the Constitution ratified in 1789 or in the relevant Amendments that every classification based on age is outlawed. Yet there is much in the Constitution and the relevant Amendments to indicate that states retain sovereign powers not expressly surrendered, and these surely include the power to choose the employees they feel are best able to serve and protect their citizens.[8]

And even were we to assume, *arguendo*, that Congress could redefine the Fourteenth Amendment, I would still reject the power of Congress to impose the Age Act on the states when Congress, in the same year that the Age Act was extended to the states, passed mandatory retirement legislation of its own, Pub. L. 93–350, 88 Stat. 356, codified at 5 U. S. C. § 8335, for law enforcement officers and firefighters. Over eight years have elapsed since the Age Act was extended to the states, yet early retirement is still required of federal air traffic controllers, 5 U. S. C. § 8335(a) (1976 ed., Supp. V), federal law enforcement officers, § 8335(b), federal firefighters, *ibid.*, employees of the Panama Canal Commission and the Alaska Railroad, § 8335(c), members of the Foreign Service, 22 U. S. C. § 4052 (1976 ed., Supp. V), and members of the Armed Services, 10 U. S. C. § 1251 (1976 ed., Supp. V).

---

[8] It has been suggested that where a congressional resolution of a policy question hinges on legislative facts, the Court should defer to Congress' judgment because Congress is in a better position than the Court to find the relevant facts. Cox, The Role of Congress in Constitutional Determinations, 40 U. Cin. L. Rev. 187, 229–230 (1971). While this theory may have some importance in matters of strictly federal concern, it has no place in deciding between the legislative judgments of Congress and that of the Wyoming Legislature. Congress is simply not as well equipped as state legislators to make decisions involving purely local needs.

## III

I believe I have demonstrated that neither the Constitution nor any of its Amendments have transferred from the states to the Federal Government the essentially local function of establishing standards for choosing state employees. The Framers did not give Congress the power to decide local employment standards because they wisely realized that as a body, Congress lacked the means to analyze the factors that bear on this decision, such as the diversity of occupational risks, climate, geography, and demography. Since local conditions generally determine how a job should be performed, and who should perform it, the authority and responsibility for making employment decisions must be in the hands of local governments, subject only to those restrictions unmistakably contemplated by the Fourteenth Amendment. Intrusion by Congress into this area can lead only to ill-informed decisionmaking.

And even if Congress had infinite factfinding means at its disposal, conditions in various parts of the country are too diverse to be susceptible to a uniformly applicable solution. Wyoming is a State with large sparsely populated areas, where law enforcement often requires substantial physical stamina; the same conditions are not always encountered by law enforcement officers in Rhode Island, which has far less land area, no mountains, and no wilderness. Problems confronting law enforcement officers in Alaska or Maine may be unlike those encountered in Hawaii and Florida. Barring states from making employment decisions tailored to meet specific local needs undermines the flexibility that has long allowed industrial states to live under the same flag as rural states, and small, densely populated states to coexist with large, sparsely populated ones.

The reserved powers of the states and Justice Brandeis' classic conception of the states as laboratories, *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting), are turned on their heads when national rather than state governments assert the authority to make decisions on

the age standard of state law enforcement officers. Flexibility for experimentation not only permits each state to find the best solutions to its own problems, it is the means by which each state may profit from the experiences and activities of all the rest. Nothing in the Constitution permits Congress to force the states into a Procrustean national mold that takes no account of local needs and conditions. That is the antithesis of what the authors of the Constitution contemplated for our federal system.

JUSTICE POWELL, with whom JUSTICE O'CONNOR joins, dissenting.

I join THE CHIEF JUSTICE's dissenting opinion, but write separately to record a personal dissent from JUSTICE STEVENS' novel view of our Nation's history.

I

JUSTICE STEVENS begins his concurring opinion with the startling observation that the Commerce Clause "was the Framers' response to the *central problem* that gave rise to the Constitution itself." *Ante,* at 244 (emphasis added). At a subsequent point in his opinion, he observes that "this Court has construed the Commerce Clause to reflect the *intent of the Framers* . . . to confer a power on the National Government adequate to discharge its *central mission.*" *Ante,* at 246–247 (emphasis added).[1] JUSTICE STEVENS further states that "*National League of Cities* not only was incorrectly decided, but also is inconsistent with the *central purpose* of the Constitution itself . . . ." *Ante,* at 249 (emphasis added).

No one would deny that removing trade barriers between the States was *one* of the Constitution's purposes. I sug-

---

[1] The authority on which JUSTICE STEVENS primarily relies is an extrajudicial lecture delivered by Justice Rutledge in 1946. *Ante,* at 244–245. Justice Rutledge declared that the "proximate cause of our national existence" was not the desire to assure the great "democratic freedoms"; rather it was the need "to secure freedom of trade" within the former Colonies. W. Rutledge, A Declaration of Legal Faith 25 (1947).

gest, however, that there were other purposes of equal or greater importance motivating the statesmen who assembled in Philadelphia and the delegates who debated the ratification issue in the state conventions.  No doubt there were differences of opinion as to the principal shortcomings of the Articles of Confederation.  But one can be reasonably sure that few of the Founding Fathers thought that trade barriers among the States were "the central problem," or that their elimination was the "central mission" of the Constitutional Convention.  Creating a National Government within a federal system was far more central than any 18th-century concern for interstate commerce.

It is true, of course, that this Court properly has construed the Commerce Clause, and extended its reach, to accommodate the unanticipated and unimaginable changes, particularly in transportation and communication, that have occurred in our country since the Constitution was ratified. If JUSTICE STEVENS had written that the Founders' intent in adopting the Commerce Clause nearly two centuries ago is of little relevance to the world in which we live today, I would not have disagreed.  But his concurring opinion purports to rely on their intent.  *Ante*, at 246.  I therefore write—briefly, in view of the scope of the subject—to place the Commerce Clause in proper historical perspective, and further to suggest that even today federalism is not, as JUSTICE STEVENS appears to believe, utterly subservient to that Clause.

## II

The Constitution's central purpose was, as the name implies, to constitute a government.  The most important provisions, therefore, are those in the first three Articles relating to the establishment of that government.  The system of checks and balances, for example, is far more central to the larger perspective than any single power conferred on any branch.  Indeed, the Virginia Plan, the initial proposal from which the entire Convention began its work, focuses on the

framework of the National Government without even mentioning the power to regulate commerce.[2]

Apart from the framework of government itself, the Founders stated their motivating purposes in the Preamble to the Constitution:

> "to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty . . . ."

These purposes differ little from the concerns motivating the States in the Articles of Confederation: "their common defence, the security of their liberties, and their mutual and general welfare." Art. III. Although the "general Welfare" recognized by the Constitution could embrace the free flow of trade among States (despite the fact that the same language in the Articles of Confederation did not), it is clear that security "against foreign invasion [and] against dissen-

---

[2] Whatever may have sparked the Annapolis Convention, see *ante,* at 245, and 245–246, n. 1, it is clear that the focus of attention at the Constitutional Convention in Philadelphia was the formation of a new government. Madison's report of the proceedings begins: "Monday May 14th 1787 was the day fixed for the meeting of the deputies in Convention for revising the federal system of Government." 1 M. Farrand, The Records of the Federal Convention of 1787, p. 3 (rev. ed. 1937) (footnote omitted). After dealing with several preliminary matters, see *id.,* at 1–17, the "main business," *id.,* at 18 (J. Madison), opened on May 29 with Edmund Randolph's speech proposing the Virginia Plan. Almost all of the Plan's resolutions dealt with the appropriate structure for the new government. Only the sixth resolution dealt with legislative powers at all. And far from stressing any power to regulate interstate commerce, it simply declared, in relevant part, that "the National Legislature ought to be impowered to enjoy the Legislative Rights vested in Congress by the Confederation & moreover to legislate in all cases to which the separate States are incompetent, or in which the harmony of the United States may be interrupted by the exercise of individual Legislation . . . ." *Id.,* at 21. While this language was, no doubt, broad enough to include the power to regulate interstate commerce, there was certainly no emphasis on that particular power.

tions between members of the Union" was of at least equal importance.   See Speech by Edmund Randolph (May 29, 1787), reprinted in 1 M. Farrand, The Records of the Federal Convention of 1787, p. 18 (rev. ed. 1937) (J. Madison).[3]

The power to achieve the purposes identified in the Preamble was not delegated solely to Congress.   If, however, one looks at the powers that were so delegated, the position of the Commerce Clause hardly suggests that it was the "central" concern of the patriots who formed our Union.   The enumeration of powers in Art. I, § 8, begins with the "Power To lay and collect Taxes."[4]   This is followed by the power "to pay the Debts" of the United States.   Then, consistent with the Preamble, comes the power to "provide for the common Defence and general Welfare."   See n. 3, *supra*.   The power to regulate interstate commerce is only one among nearly a score of other powers that followed.   It is evident that the authority to tax and to "provide for the common Defence" loomed larger among the concerns of the Founders than other powers granted Congress.   The Commerce Clause was given no place of particular prominence.   So much for what the Constitution's language and structure teach about the Framers' intent.

### III

One would never know from the concurring opinion that the Constitution formed a federal system, comprising a Na-

---

[3] No one in the ratification debate doubted that the power to defend the country was essential, and must be given to the central government.   See The Federalist No. 41, pp. 269–276 (J. Cooke ed. 1961) (J. Madison). Even under the Articles of Confederation, it was considered necessary to give Congress "the sole and exclusive right and power of determining on peace and war."   Art. IX.

[4] A major weakness of the system created by the Articles of Confederation was the central government's inability to collect taxes directly.   See 1 Farrand, *supra* n. 2, at 284 (remarks of A. Hamilton).   Remedying this defect was thus one of the most important purposes of the Constitutional Convention.   See R. Paul, Taxation in the United States 4–5 (1954); The Federalist No. 30 (A. Hamilton).

tional Government with delegated powers and state governments that retained a significant measure of sovereign authority. This is clear from the Constitution itself, from the debates surrounding its adoption and ratification, from the early history of our constitutional development, and from the decisions of this Court. It is impossible to believe that the Constitution would have been recommended by the Convention, much less ratified, if it had been understood that the Commerce Clause embodied the National Government's "central mission," a mission to be accomplished even at the expense of regulating the personnel practices of state and local governments.[5]

## A

The Bill of Rights imposes express limitations on national powers. The Tenth Amendment, in particular, explicitly recognizes the retained power of the States: "The powers not delegated to the United States by the Constitution, nor pro-

---

[5] JUSTICE STEVENS' citation of *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824), in support of his position, see *ante*, at 248–249, n. 8, is essentially irrelevant, for Chief Justice Marshall was not concerned with a State's sovereign power. Gibbons carried passengers between New Jersey and New York on two steamboats licensed under an Act of Congress, while Ogden claimed the benefit of a New York law granting an exclusive right to navigate steamboats on New York waters. The power to grant such a monopoly clearly is not one of a State's traditional sovereign powers. On the contrary, it is part of the power to regulate interstate navigation that lies within the very core of the Commerce Clause. I certainly do not suggest that principles of federalism should prevent Congress from regulating navigation. The present case, however, concerns the power to determine the terms and conditions of employment for the officers and employees who constitute a State's government. This is as sovereign a power as any that a State possesses, and it is far removed from the original concerns of the Commerce Clause. Indeed, this case illustrates how far the Federal Government, with the Court's approval, has departed from the principles upon which our federal union was formed. The "commerce" at issue, incredible as it would have seemed even a few years ago, let alone in Chief Justice Marshall's day, is the effect on trade among the States of Wyoming's requirement that its game wardens retire at age 65 rather than 70.

hibited by it to the States, are reserved to the States respectively, or to the people." This limitation was, of course, implicit in the Constitution as originally ratified. Even those who opposed the adoption of a Bill of Rights did not dispute the propriety of such a limitation. Rather, they argued that it was unnecessary, for the Constitution delegated certain powers to the central government, and those not delegated were necessarily retained by the States or the people.[6] Furthermore, the inherent federal nature of the system is clear from the structure of the National Government itself. Members of Congress and Presidential electors are chosen by States. Representation in the Senate is apportioned by States, regardless of population. The Full Faith and Credit Clause gives particular recognition to the States' "public Acts, Records, and judicial Proceedings." Article IV, § 4, requires a republican form of government in each State. The initial ratification of the Constitution was accomplished on a state-by-state basis, and subsequent Amendments require approval by three-fourths of the States.

It was also clear from the contemporary debates that the Founding Fathers intended the Constitution to establish a federal system. As James Madison, "the Father of the Constitution," explained to the people of New York:

"The powers delegated by the proposed Constitution to the Federal Government, are few and defined. Those which are to remain in the State Governments are numerous and indefinite. The former will be exercised

---

[6] Alexander Hamilton, for example, made this argument in The Federalist No. 84, pp. 578–579 (J. Cooke ed. 1961). See also *United States* v. *Darby*, 312 U. S. 100, 124 (1941) (Tenth Amendment "declaratory of the relationship between the national and state governments as it had been established by the Constitution before the amendment"); *United States* v. *Sprague*, 282 U. S. 716, 733 (1931) ("The Tenth Amendment was intended to confirm the understanding of the people at the time the Constitution was adopted, that powers not granted to the United States were reserved to the States or to the people. It added nothing to the instrument as originally ratified . . .").

principally on external objects, as war, peace, negociation, and foreign commerce . . . . The powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the State." The Federalist No. 45, p. 313 (J. Cooke ed. 1961).

There can be no doubt that Madison's contemporaries shared this view. See, *e. g.*, Letter of Roger Sherman and Oliver Ellsworth to the Governor of Connecticut (Sept. 26, 1787), reprinted in 3 Farrand, *supra* n. 2, at 99 (description of proposed Constitution) (The "powers [vested in Congress] extend only to matters respecting the common interests of the union, and are specially defined, so that the particular states retain their sovereignty in all other matters").

During the earliest years of our constitutional development, principles of federalism were not only well recognized, they formed the basis for virtually every State in the Union to assert its rights as a State against the Federal Government. In 1798, for example, Thomas Jefferson drafted the Kentucky Resolutions,[7] which were passed by the Kentucky Legislature to protest the unpopular Alien and Sedition Acts, Act of June 18, 1798, 1 Stat. 566; Act of June 25, 1798, 1 Stat. 570; Act of July 6, 1798, 1 Stat. 577; Act of July 14, 1798, ch. 74, 1 Stat. 596. At the same time, Madison drafted similar Virginia Resolutions, which were adopted by the Virginia

---

[7] In the first Resolution, Jefferson explained "[t]hat the several states composing the United States of America are not united on the principle of unlimited submission to their general government; but that, by compact, under the style and title of a Constitution for the United States, and of amendments thereto, they constituted a general government for special purposes, delegated to that government certain definite powers, reserving, each state to itself, the residuary mass of right to their own self-government; and that whensoever the general government assumes undelegated powers, its acts are unauthoritative, void, and of no force." Kentucky Resolution of 1798, reprinted in 4 J. Elliot, Debates on the Federal Constitution 540 (2d ed. 1863).

General Assembly. See 4 J. Elliot, Debates on the Federal Constitution 528–529 (2d ed. 1863). In both cases it was clear that the powers reserved to the States were treated as a substantive limitation on the authority of Congress. It was asserted that these powers enabled a State to interpose its will against *any* action by the National Government. Thirty years later, Jefferson and Madison's views were expanded by John C. Calhoun in his nullification doctrine—the extreme view that eventually led to the War Between the States.[8] See 6 The Works of John C. Calhoun 1–57 (R. Cralle ed. 1859) (original draft of South' Carolina Exposition of 1828).

The view that the reserved powers of the States limited the delegated powers of the National Government was not confined to the South. The New England States, for example, vehemently opposed the Embargo Act of Dec. 22, 1807, ch. 5, 2 Stat. 451, and they turned to their rights as States in defense. In 1809, the Governor of Connecticut, with the support of the legislature, refused to comply with the Act of Jan. 9, 1809, 2 Stat. 506, which Congress passed to enforce the embargo.[9] In Massachusetts the story was similar: The

---

[8] In referring to this early and interesting history, I do not suggest that either the doctrine of interposition or that of nullification was constitutionally sound. In any event, they were laid to rest in one of history's bloodiest fratricides, ending at Appomattox in 1865. The views of these great figures in our history are, however, directly pertinent to the question whether there was ever any *intention* that the Commerce Clause would empower the Federal Government to intrude expansively upon the sovereign powers reserved to the States. See n. 5, *supra.*

[9] The Governor explained to a special session of the state legislature that "[w]henever our national legislature is led to overleap the prescribed bounds of their *[sic]* constitutional powers, on the State Legislatures, in great emergencies, devolves the arduous task—it is their right—it becomes their duty, to interpose their protecting shield between the right and liberty of the people, and the assumed power of the General Government." Speech of Governor Jonathan Trumbull (Feb. 23, 1809), reprinted in H. Ames, State Documents on Federal Relations 40 (1906). The Assembly promptly passed resolutions supporting the Governor's position

legislature denounced the enforcement Act as "unjust, oppressive and unconstitutional, and not legally binding on the citizens of this state." Resolutions of the Massachusetts Legislature (Feb. 15, 1809), reprinted in H. Ames, State Documents on Federal Relations 35 (1906). When Congress enacted the Embargo Act of Dec. 17, 1813, 3 Stat. 88, the Massachusetts Legislature declared it "a manifest . . . abuse of power" that infringed the "sovereignty reserved to the States"[10] and justified the legislature in "interpos[ing] its power" to protect its citizens from "oppression," Resolutions of the Massachusetts Legislature (Feb. 22, 1814), reprinted in Ames, *supra*, at 71–72. Even Daniel Webster, famous for his defense of the rights of the National Government, recognized that principles of federalism limit the power of Congress.[11]

## B

It is clear beyond question that state sovereignty always has been a basic assumption of American political theory. Although its contours have changed over two centuries, state sovereignty remains a fundamental component of our system that this Court has recognized time and time again. Even to

and concluding that the embargo legislation was "incompatible with the constitution of the United States, and encroach[ed] upon the immunites of [the] State." Resolutions of the General Assembly (Feb. 23, 1809), reprinted in Ames, *supra*, at 41. In view of its duty to support the Constitution, the legislature declined "to assist, or concur in giving effect to the aforesaid unconstitutional act, passed, to enforce the Embargo." *Ibid.*

[10] The legislature explained that the State's sovereignty was reserved, in part, to protect its citizens from excessive federal power. Resolutions of the Massachusetts Legislature (Feb. 22, 1814), reprinted in Ames, *supra*, at 71.

[11] During a debate in Congress on a conscription bill and a bill for the enlistment of minors, Webster declared that if these measures were enacted it would be "the solemn duty of the State Governments" to interpose their authority to prevent enforcement. In his view, this was "among the objects for which the State Governments exist." Speech on the Conscription Bill (Dec. 9, 1814), reprinted in 14 The Writings and Speeches of Daniel Webster 55, 68 (1903).

refer to the highlights would go far beyond the scope of this dissent. I therefore mention only a few of the decisions from last Term alone in which the Court expressly noted that States retain significant sovereign powers.[12]  In *Community Communications Co.* v. *City of Boulder*, 455 U. S. 40 (1982), we considered the state-action exemption from the antitrust laws. Since "'under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority,'" *id.*, at 49 (quoting *Parker* v. *Brown*, 317 U. S. 341, 351 (1943)), we had previously recognized an antitrust exemption for States acting "in the exercise of [their] sovereign powers," 455 U. S., at 48. We held that this exemption does not extend to cities, but in so doing we repeatedly stressed the sovereign nature of States. See *id.*, at 48–54.  In *United Transportation Union* v. *Long Island R. Co.*, 455 U. S. 678 (1982), we unanimously upheld the application of the Railway Labor Act to a state-owned railroad. We reached this conclusion, however, only by finding that operation of the railroad was not one of the State's "constitutionally preserved sovereign function[s]." *Id.*, at 683. And in *FERC* v. *Mississippi*, 456 U. S. 742 (1982), we considered whether parts of the Public Utility Regulatory Poli-

---

[12] See, *e. g.*, *Rodriguez* v. *Popular Democratic Party*, 457 U. S. 1, 8 (1982) ("Puerto Rico, like a state, is an autonomous political entity, 'sovereign over matters not ruled by the Constitution'") (quoting *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 673 (1974)); *Insurance Corp. of Ireland, Ltd.* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 703, n. 10 (1982) (States are "'coequal sovereigns in a federal system'") (quoting *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 292 (1980)); *Engle* v. *Isaac*, 456 U. S. 107, 128 (1982) (discussing "the States' sovereign power to punish offenders"); *Underwriters National Assurance Co.* v. *North Carolina Life & Accident & Health Ins. Guaranty Assn.*, 455 U. S. 691, 704 (1982) (recognizing "the structure of our Nation as a union of States, each possessing equal sovereign powers"); *Cabell* v. *Chavez-Salido*, 454 U. S. 432, 444–447 (1982) (relying on State's "sovereign" police powers); *Fair Assessment in Real Estate Assn.* v. *McNary*, 454 U. S. 100, 108 (1981) (state courts are those "'of a different, though paramount sovereignty'") (quoting *Matthews* v. *Rodgers*, 284 U. S. 521, 525 (1932)).

cies Act "constituted an invasion of state sovereignty in violation of the Tenth Amendment," *id.*, at 752. Although the Court upheld the statute, it was clear that state sovereignty was an essential element to be considered in reaching that conclusion. See *id.*, at 758–771.

In sum, all of the evidence reminds us of the importance of the principles of federalism in our constitutional system. The Founding Fathers, and those who participated in the earliest phases of constitutional development, understood the States' reserved powers to be a limitation on the power of Congress—including its power under the Commerce Clause. And the Court has recognized and accepted this fact for almost 200 years.[13]

## IV

JUSTICE STEVENS' concurring opinion recognizes no limitation on the ability of Congress to override state sovereignty in exercising its powers under the Commerce Clause. His opinion does not mention explicitly either federalism or state sovereignty. Instead it declares that "[t]he *only* basis for questioning the federal statute at issue here is the pure judicial fiat found in this Court's opinion in *National League of Cities* v. *Usery.*" *Ante,* at 248 (emphasis added). Under this view it is not easy to think of any state function—however sovereign—that could not be pre-empted.

---

[13] Of course I do not denigrate the importance of the Commerce Clause. It is essential to the functioning of our National Government. It is, however, only one provision of a Constitution that embodies strong principles of federalism.