Thomas QUINN, Plaintiff,

v.

NEW YORK STATE ELECTRIC AND
GAS CORPORATION, Defendant.

No. 82–CV–716.

United States District Court,
N.D. New York.

Aug. 17, 1983.

Syracuse University College of Law Public Interest Law Firm, Syracuse, N.Y., for plaintiff; Daan Braveman, William Banks, Syracuse, N.Y., of counsel.

Hinman, Howard & Kattell, Binghamton, N.Y., for defendant; James S. Gleason, Binghamton, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Plaintiff Thomas Quinn, a 44 year old employee of defendant New York State Electric and Gas Corporation ("NYSE & G") was rejected in his application to enter a training program for a position in the Utility Construction and Maintenance ("UC & M") Department because of a policy of the defendant to accept only those under 32 years of age into the program. He claims that this policy violates the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"), and seeks injunctive and compensatory relief.

Quinn alleges in his complaint that on September 14, 1981, NYSE & G posted notice that positions would become available in the UC & M Department; that he bid for a position but was rejected; that five persons with less seniority were eventually selected; that the defendant's collective bargaining agreement expressly restricts training for UC & M positions to those under age 32; that he had not been allowed to compete for the position because of his age.

In NYSE & G's answer to the complaint, it admits the existence of a maximum age requirement for UC & M trainees, and further admits that the plaintiff was not allowed to compete for the position on an equal basis because of his age.[1] However, defendant denies depriving the plaintiff of any rights under the ADEA, asserting four affirmative defenses: (1) the complaint fails to state a claim upon which relief can be granted; (2) the program is exempt from the provisions of the ADEA under EEOC regulation, 29 CFR § 1625.13, which permits "bona fide apprenticeship programs" to be limited to youths; (3) the age limitation is a bona fide occupational qualification ("BFOQ") within the meaning of 29 U.S.C. § 623(f)(1); and (4) plaintiff is estopped from challenging an age limitation that is part of a collective bargaining agreement ratified by plaintiff's union.

The Court now has before it cross-motions for summary judgment. Plaintiff's motion seeks only partial summary judgment, striking defendant's first, second, and fourth affirmative defenses. Defendant seeks judgment in its favor based on its second affirmative defense.

As set forth below, the Court has determined that the UC & M Apprentice and Progression Program is a bona fide apprenticeship program within the meaning of 29 CFR § 1625.13, but that such regulation is inconsistent with the language, purpose, and history of the ADEA, and is not to be given effect. The Court therefore grants plaintiff's motion for partial summary

1. To be precise, the defendant responded to the allegation that plaintiff was not allowed to compete for the position on an equal basis because of his age by denying the allegation "to the extent that such allegations (sic) claim that defendant is acting unlawfully with respect to the plaintiff" *Answer* ¶ 4. However, as defendant makes clear in the affidavit of William Walker, vice-president for personnel, "[p]laintiff's application was not considered because he was over the 32 year age limit negotiated by NYSE & G and the Union." *Id.* ¶ 25.

judgment, and denies defendant's motion for summary judgment.

## I.

The affidavits and exhibits submitted by NYSE & G thoroughly describe the background and nature of the UC & M Apprentice and Progression Program. The program was first established in 1958, under the terms of a "Memorandum of Agreement" between NYSE & G and the union which represents its production employees (System Council U–7 of the International Brotherhood of Electrical Workers). The original Memorandum limited admission to the program to individuals under the age of 30, but the age limit was increased to 32 by amendment in 1973. The program rules which were operative in 1981 when Quinn's application was rejected are set forth on pp. 102–106 of the *1981–83 Agreement* between NYSE & G and the union.

The UC & M Apprentice and Progression Program consists of on-the-job training, extensive reading assignments, and periodic testing for a training period of five years, with over 144 hours of instruction in each year. The program emphasizes less skilled and less complicated tasks during the beginning months and gradually leads the trainee through the highly skilled and complex activities which are a part of the First Class UC & M job classification. Advancement in the program is contingent on the trainee receiving satisfactory appraisals and passing each of the periodic tests.

Those who successfully complete the various stages of the program are eligible for promotion to a position in the UC & M Department commensurate with their level of training. *1981–1983 Agreement* ¶ 9. When a first or second class vacancy in the UC & M Department exists, NYSE & G will fill it from within the company whenever possible. *Id.* ¶ 10. Under certain circumstances, a vacancy will be filled from among qualified applicants on the basis of seniority. *Id.* ¶ 12.

Both Broome Community College and Cortland Community College offer course credit toward various technical degrees for satisfactory completion of the UC & M Apprentice and Training Program.

## II.

It is evident from the statements submitted pursuant to Local Rule 10(c) as well as from the other materials submitted by the parties on these motions that there is no genuine issue as to any material fact, and that the issues for determination by the Court are issues of law.[2]

█ Turning first to plaintiff's motion, the Court has little hesitation in granting summary judgment striking two of the three affirmative defenses challenged herein. The first, that "the plaintiff's complaint fails to state a claim upon which relief can be granted," is plainly insupportable. Such defense challenges the facial sufficiency of the complaint, and dismissal on such grounds is not justified unless "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Cayuga v. Cuomo,* 565 F.Supp. 1297 at 1311 (N.D.N.Y.1983) (McCurn, D.J.).

Plaintiff has set forth in his complaint all of the elements necessary for a claim under the ADEA. The only challenges advanced by the defendant to the claim are those in its remaining three affirmative defenses. Two of those, however—the bona fide apprenticeship program and the BFOQ de-

---

**2.** As is often the case, each party has included in its 10(c) statement a characterization or conclusion that would be disputed by the other party. Plaintiff states in ¶ 15 of its statement that "a U.C. & M. position is promotional." Defendant states in ¶ 1 of its statement that its UC & M program is "a bona fide apprentice program". Though clearly neither party would agree with the other's characterization, the un-

derlying material facts upon which those characterizations are based are not in dispute.

Defendant also contests two other statements by the plaintiff concerning his length of employment at NYSE & G and the role seniority played in selecting among qualified applicants for UC & M positions. Though disputed, such issues are not material to the determinations to be made on the instant cross-motions.

fenses—require the Court to consider matters outside of the complaint, and could in no event furnish a basis for dismissal for failure to state a claim. 5 Wright & Miller, *Fed.Prac. & Proc.* § 1356 at 592 (1969 ed.).

■ The fourth affirmative defense, estoppel, may arguably be characterized as a challenge to the complaint on its face. However, it is insufficient as a matter of law. A discriminatory policy is not immune from challenge by an employee by virtue of its incorporation in a collective bargaining agreement. *Levine v. Farleigh Dickenson University,* 646 F.2d 825, 832 (3d Cir.1981). Cf. *Alexander v. Gardner-Denver,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII rights and remedies are distinct from and independent of those secured through collective bargaining); *Air Line Pilots Ass'n, Int'l v. Trans World Airlines, Inc.,* 713 F.2d 940 at 955 n. 17 (2d Cir.1983) (determination of rights under collective bargaining agreement did not resolve issues pertaining to ADEA claim).

Thus summary judgment against NYSE & G is warranted with respect to its first and fourth affirmative defenses. Plaintiff's remaining challenge on this motion, to the second affirmative defense, requires that the court determine whether the defendant's UC & M Apprentice and Progression Program is a "bona fide apprenticeship program" within the meaning of 29 CFR § 1625.13; and if so, whether that exemption is a valid administrative interpretation of the ADEA.

### III.

The administrative exemption for "bona fide apprenticeship programs", set forth at 29 CFR § 1625.13, provides:

Age limitations for entry into bona fide apprenticeship programs were not intended to be affected by the A.D.E.A. Entry into most apprenticeship programs has traditionally been limited to youths under specified ages. This is in recognition of the fact that apprenticeship is an extension of the educational process to prepare young men and women for skilled employment. Accordingly, the prohibitions contained in the Act will not be applied to bona fide apprenticeship programs which meet the standards specified in §§ 521.2 and 521.3.

The standards specified in §§ 521.2 and 521.3 are set by the Wage and Hour Division of the Department of Labor, and apply to the employment of apprentices.

### A.

■ Plaintiff contends first that the UC & M program is not a "bona fide apprenticeship program" because NYSE & G failed to secure a certificate referred to in § 521.3, which authorizes the payment of apprentices at less than minimum wage. That regulation states, in pertinent part:

§ 521.3 Standards of Apprenticeship.

An apprenticeship program must conform with or substantially conform with the following standards before the Administrator or his authorized representative will issue a special certificate authorizing employment of an apprentice under such program at wages lower than the minimum wages applicable under Section 6 of the Act: . . . .

The regulation goes on to list nine standards, largely concerning the quality and quantity of instruction required in the apprenticeship program.

Nowhere in § 521.3 is there a requirement that an employer actually obtain a certificate of compliance. Such certificate would only be useful if the employer wishes to pay its apprentices less than minimum wage. NYSE & G pays its apprentices in excess of minimum wage and therefore did not obtain the certificate. It is, nevertheless in compliance with the substantive standards that make it eligible for a certificate. Under the language and logic of 29 CFR § 1625.13, compliance with such substantive standards qualifies the program as a "bona fide apprenticeship program".

### B.

■ Plaintiff next argues that the regulation is only intended to exempt from the ADEA those apprenticeship programs

which have been limited to "youths under specified ages". It suggests as an appropriate maximum age for a qualifying apprenticeship program the age of twenty-one, since that is the maximum age for a "youth" in the definitional section of the Department of Labor's regulations governing the Comprehensive Employment and Training Act (CETA) Youth Program. In plaintiff's view, the UC & M program is not entitled to the exemption under 29 CFR § 1625.13 because it is open to employees who are over twenty-one years old.

There may well be a certain degree of logic in providing a maximum entrance age of twenty-one for apprenticeship programs entitled to the exemption from the ADEA; such a provision would then be consistent with the agency rationale that "[e]ntry into most apprenticeship programs has traditionally been limited to youths under specified ages." 29 CFR § 1625.13.

Be that as it may, there is no such maximum age in the applicable regulations. The only age limitation incorporated into 29 CFR § 1625.13 is in the definition of "apprentice" set forth in § 521.2(a):

> "Apprentice" means a worker at least sixteen years of age, except where a higher minimum age standard is otherwise fixed by law....

The UC & M program is in compliance with this age limitation.

There is no basis for reading the maximum age limits in the CETA regulations into the relevant EEOC regulation. Indeed, the CETA regulation relied upon by the plaintiff is limited by its own terms to Youth Employment and Training Programs described in Subpart A of 20 CFR § 680. 20 CFR § 675.6–8.

Moreover, it may well be that the EEOC considered and rejected the concept of a maximum entrance age for apprenticeship programs as a condition for exemption from the ADEA. Such a requirement would induce employers to deny training opportunities to qualified persons at an even earlier age than the NYSE & G policy challenged here. This result would hardly be consistent with the policy embodied by the ADEA.

Thus, it is reasonable to assume that, while the EEOC created an exemption for apprenticeship programs on the ground that such programs have traditionally been limited to youths, it nevertheless chose not to *require* employers to limit their apprenticeship programs to youths as a condition of receiving the exemption.

### C.

■ In its final argument that NYSE & G's UC & M program does not qualify for the administrative exemption, plaintiff maintains that the program is not truly an "extension of the educational process to prepare men and women for skilled employment", 25 CFR § 1625.13, but is rather a means to train employees for promotional jobs within the company. In support of this contention, plaintiff cites a passage in the collective bargaining agreement description of the program which states that "[i]t is the policy of the Company to *promote* from within whenever possible." *1981–1983 Agreement,* 103, ¶ 10 (emphasis added). Plaintiff also emphasizes that UC & M positions are advertised only within the company and are open only to workers with a certain degree of skill and experience and that appointment to UC & M positions is based on seniority.

In the Court's view, however, the UC & M program is quite clearly an educational program that prepares men and women for skilled employment. It is apparent from the submissions to the Court that the program involves extended and rigorous technical instruction which will qualify successful trainees for first or second class utility construction and maintenance positions. It is relevant here that course credit is awarded at two community colleges for completion of the program.

At the same time the program evidently grooms trainees for promotion to vacant positions within the company. The Court fails to discern any reason why this promotional function of the program would negate its educational function. Nothing in 25 CFR § 1625.13 disentitles an apprenticeship program to its exemption on the ground that the program serves to advance its trainees to higher positions in the com-

pany, subject to certain seniority and other selection provisions. In short, the UC & M program is both educational and promotional, and there is no inconsistency in those functions that would disqualify the program for exemption under 25 CFR § 1625.-13.

The Court therefore concludes that NYSE & G's UC & M apprenticeship and progression program complies with the provisions of 25 CFR § 1625.13 and would be exempt from the prohibitions of the ADEA if that regulation were valid.

## IV.

The parties agree that 25 CFR § 1625.13 is an interpretative regulation and that,

under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), its weight upon judicial review "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Although it appears to the Court that the EEOC could have promulgated an exemption for apprenticeship programs as a "legislative rule", which would warrant a higher degree of deference, it evidently chose not to do so.[3] The Court therefore agrees with the parties that the regulation is properly judged against the *Skidmore* standard.

---

**3.** As Professor Davis explains in his treatise,

A legislative rule is the product of an exercise of delegated legislative power to make law through rules. An interpretive rule is any rule an agency issues without exercising delegated legislative power to make law through rules.

Kenneth Culp Davis, *Administrative Law Treatise* § 7.8 at 36 (1979 ed.)

The ADEA does contain an explicit delegation of rulemaking authority to the Secretary of Labor, including the authority to establish exemptions from the Act:

§ 628 *Rules and Regulations; exemptions* In accordance with the provisions of [the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq.], the Secretary of Labor may issue such rules and regulations as he may consider necessary or appropriate for carrying out this Act, and may establish such reasonable exemptions to and from any or all provisions of this Act as he may find necessary and proper in the public interest.

This and all other functions of the Secretary of Labor under the ADEA were transferred to the Equal Employment Opportunity Commission in 1979. Reorganization Plan No. 1 of Feb. 23, 1978, 43 Fed.Reg. 19807, eff. Jan. 1, 1979. Thus, the EEOC apparently had authority to promulgate the exemption for apprenticeship programs pursuant to 29 U.S.C. § 628 and the Reorganization Plan of 1978; had it done so, the rule would be entitled to greater deference. *See,* Larson, *Employment Discrimination* § 100.12 at 21–43 (regulations of the Labor Department under § 628 are entitled to greater deference than EEOC guidelines). *See also,* 5 U.S.C. § 706.

However, the EEOC itself considers the regulation in question to be interpretative, and not legislative. The apprenticeship exemption was first promulgated in 1969 by the Secretary of Labor, 34 Fed.Reg. 323; it then appeared at 29

CFR § 860.106. The introductory regulation to that part of the Subchapter on Age Discrimination in Employment provided as follows:

§ 860.1 Purpose of this part.

This part is intended to provide an interpretative bulletin on the Age Discrimination in Employment Act of 1967 like Subchapter B of this title relating to the Fair Labor Standards Act of 1938. Such interpretations of this Act are published to provide "a practical guide to employers and employees as to how the office representing the public interest in its enforcement will seek to apply it" (*Skidmore v. Swift & Co.*, 323 U.S. 134, 138 [65 S.Ct. 161, 163, 89 L.Ed. 124] ). These interpretations indicate the construction of the law which the Department of Labor believes to be correct, and which will guide it in the performance of its administrative and enforcement duties under the Act unless and until it is otherwise directed by authoritative decisions of the Courts or concludes, upon reexamination of an interpretation, that it is incorrect.

After the EEOC assumed responsibility for administration of the ADEA in 1979, it proposed the rescission of the interpretative exemption for apprenticeship programs, and it further proposed a legislative rule, pursuant to its authority under 29 U.S.C. § 628 and the Reorganization Plan of 1978, which would have expressly subjected apprenticeship programs to the ADEA. 45 Fed.Reg. 64212 (Sept. 29, 1980). However, after receiving comment on its proposal, the EEOC reinstated the apprenticeship exemption without any change. 46 Fed.Reg. 47724 (Sept. 29, 1981). In so doing, the Commission recounted the administrative history of that regulation, noting that it had previously proposed substituting the Secretary's "interpretation" with a "substantive rule", but had decided instead to "republish the existing interpretation". 46 Fed.Reg., *supra* at 47726.

## V.

■ There is no support for a bona fide apprenticeship program exemption in the language of the Age Discrimination in Employment Act, as amended. 29 U.S.C. § 621 et seq. Indeed, in its statement of findings and purpose, and in the inclusive language of its proscriptions, Congress indicated that it intended no such exemption. In the preamble of the Act, Congress found, inter alia, that "the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons." 29 U.S.C. § 621(a)(2). Based on this and other findings, Congress declared:

It is therefore the purpose of this Act to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.

29 U.S.C. § 621(b).

To effectuate that remedial purpose, Congress made it unlawful for an employer, inter alia, to "limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2). However, that section does recognize two limited circumstances in which age may be used as a basis for differentiation: "where age is a bona fide occupational qualification", § 623(f)(1), and "to observe the terms of any bona fide seniority system or any bona fide employee benefit plan." . . . § 623(f)(2).

Under 29 U.S.C. § 628, the Secretary of Labor, and by extension the EEOC, is given authority to "establish such reasonable exemptions to and from any and all provisions of this Act as he may find necessary and

proper in the public interest." Although the regulation challenged here was not promulgated pursuant to such authority, see note 3, supra, the provision does indicate that Congress anticipated further exceptions would be carved from its broad prohibitions. However, the pertinent question is not whether the EEOC can make exceptions; it is, rather, whether this particular exception, for apprenticeship programs, finds support elsewhere in the language of the Act. For as the Supreme Court has stated,

We reject any suggestion that the EEOC may adopt regulations that are inconsistent with the statutory mandate. As we have held on prior occasions, its "interpretation" of the statute cannot supercede the language chosen by Congress.

Mohasco Corp. v. Silver, 447 U.S. 807, 825, 100 S.Ct. 2486, 2496, 65 L.Ed.2d 532 (1980). See also, Spencer v. Banco Real, S.A., 87 F.R.D. 739, 743 (S.D.N.Y.1980).

In the Court's view, the blanket exception for apprenticeship programs, without regard for whether the age limitation in a program is a bona fide occupational qualification, finds no support in, and is contrary to, the language of the ADEA.

A review of the legislative history of the ADEA also indicates that the apprenticeship exemption is contrary to Congressional intent. That history was recently summarized by the Supreme Court in E.E.O.C. v. Wyoming, —— U.S. ——, ——, 103 S.Ct. 1054, 1057–59, 75 L.Ed.2d 18 (1983). As the Court observed, the proposed legislation prohibiting age discrimination was submitted after three years of extensive fact-finding by the Secretary of Labor, the Executive Branch, and the Congress, which led each to the following basic conclusions:

(1) Many employers adopted specific age limitations in those States that had not prohibited them by their own antidiscrimination laws; although many other em-

Moreover, in setting forth the authority for such regulation, the EEOC conspicuously omitted a citation to 29 U.S.C. § 628.

In short, while it appears that the EEOC could have promulgated a rule pursuant to 29 U.S.C.

§ 628 which would have required greater deference from this Court, it expressly chose to reissue an interpretative ruling, reviewable under the less deferential standard set forth in Skidmore, supra.

*ployers were able to operate successfully without them.* (2) In the aggregate, these age limitations had a marked effect upon the employment of older workers. (3) Although age discrimination rarely was based on the sort of animus motivating some other forms of discrimination, it was based in large part on stereotypes unsupported by objective fact, and was often defended on grounds different from its actual causes. (4) Moreover the available empirical evidence demonstrated that arbitrary age lines were in fact generally unfounded and that, *as an overall matter, the performance of older workers was at least as good as that of younger workers.* (5) Finally, arbitrary age discrimination was profoundly harmful in at least two ways. First, it deprived the national economy of the productive labor of millions of individuals and imposed on the governmental treasury substantially increased costs in unemployment insurance and federal Social Security benefits. Second, *it inflicted on individual workers the economic and psychological injury accompanying the loss of opportunity to engage in productive and satisfying occupations.*

*E.E.O.C. v. Wyoming, supra,* 103 S.Ct. at 1057–58 (emphasis added). These conclusions, which induced Congress to prohibit age discrimination, appear fully applicable to apprenticeship programs.

Congress was aware, for instance, that seven out of the twenty-three states with age discrimination legislation in 1967 had some form of exemption for apprenticeship programs. Hearings Before the Subcomm. on Labor and Public Welfare, 90th Cong., 1st Sess., Appendix A at 117 (1967); Hearings Before the Gen. Subcomm. on Labor of the House Comm. Education and Labor, 90th Cong., 1st Sess. at 37 (1967). Yet, as stated above, the federal legislation was specifically tailored to reach unjustified "age limitations in those states that had not prohibited them by their own antidiscrimination laws." The absence of an exemption for apprenticeship programs in the federal legislation, despite congressional awareness of such provision in state laws, is indicative of an intent to not except such programs from the broad proscriptions of the statute.

Moreover, it is instructive that Congress considered—and expressly rejected—an analogous exemption for a "bona fide management training course." The committee reporting the bill explained that "so broad an exemption in the law might open a very wide door of possible abuse." H.R.Rep. No. 805, 90th Cong., 1st Sess., *reprinted in* [1967] U.S.Code Cong. & Ad.News 2213, 2217. *See also,* 113 *Cong.Rec.* 34752 (1967) (remarks of Sen. Dwyer) ("Congress feels that such a broad exception could be a very big loop-hole in age-job discrimination"). In place of a blanket exemption, Congress expected that the Secretary would recognize "bona fide age requirements" in the limited circumstances where such requirements were justifiable. H.R.Rep. No. 805, *supra.*

The hearings and debates on the proposed legislation also reveal that Congress meant to counteract unfounded stereotypes as to the capacity of older persons to be trained. For example, Senator Dwyer stated in support of S.830 that "[older persons] have been victims of the myth that holds they are too settled, too hard to retrain, and have too little time left to make valuable contributions to new employers." 113 Cong.Rec. 34751 (1976). Speaking in support of H.13054, and based on the experience of coal miners in Kentucky, Rep. Perkins stated that, "[d]espite the fact that these men are educable, retrainable, and desirous of gainful employment, they have been denied employment opportunities merely because they have reached or passed age 40." 113 Cong.Rec. 34740 (1967). Secretary of Labor Wirtz testified in support of S.830 before the Senate, and emphasized that the Department's experience under the recently enacted Manpower Development and Training Act had been that older trainees often do better than those who are younger in long-term training programs. Hearings before the Subcomm. on Labor and Public Welfare, 90th Cong. 1st Sess. at 38 (1967).

In light of the language, purpose, and legislative history of the ADEA, the administrative rationale for the exemption is unconvincing. That rationale, as stated in 29 CFR § 1625.13 itself, is simply that "[e]ntry into most apprenticeship programs has traditionally been limited to youths under specified ages. This is in recognition of the fact that apprenticeship is an extension of the educational process to prepare young men and women for skilled employment."

The invocation of "tradition" as a justification for an age limitation in employment opportunities is flatly contradictory to the purpose of the ADEA. As noted previously, Congress recognized in the preamble to the Act that "the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons." It was to remedy the unfairness, and to avoid the social and economic costs of such practices, however common, that prompted the enactment of the Act.

Nor, in the Court's view, can the explanation that "apprenticeship is an extension of the educational process" justify exempting such programs from the prohibitions of the ADEA. The EEOC is, in effect, stating that arbitrary age limitations in employment can be justified by analogizing them to arbitrary age limitations in education. The analogy may be apt, but it hardly provides reasoned support for the exemption. Moreover, there is no indication that the two community colleges which accord course credit for completion of defendant's program limit admission into such technical courses on the basis of age. On the contrary, it is safe to note that a large proportion of the student population at such community colleges are considerably past their youth.

The EEOC itself tentatively recognized that the apprenticeship exemption "runs counter to the stated purpose of the statute as enacted in 1967," and it proposed rescinding that exemption. 45 Fed.Reg. 64212, 64213 (Sept. 29, 1980). In arriving at that conclusion, the Commission thoroughly analyzed the exemption in light of the language, purpose, and legislative history of the ADEA. A brief excerpt from that analysis warrants reproduction:

The Commission believes that as remedial and humanitarian legislation, the ADEA is to be liberally construed. The statute does not support an interpretation which would completely exclude apprenticeship programs from the Act's coverage.

Second, and equally important, there is nothing in the legislative history of the Act which would support the interpretation contained in § 860.106... Congress was aware that certain state laws specifically exempted apprenticeship programs ... but nevertheless declined to enact a similar provision, with the result that apprenticeship programs were intended to be subject to the Act's coverage....

[W]hile certain apprenticeship programs may have legitimate reasons for excluding employees on the basis of age, the Commission does not feel that those few exceptions justify an interpretation which would permit all apprenticeship programs to exclude employees of any age...

The Commission believes that Section 4(f)(1) and Section 9 of the Act [29 U.S.C. §§ 623(f)(1), 628] provide sufficient flexibility to accommodate those apprenticeship programs which can establish legitimate age limitations, thereby obviating the need for the blanket exception contained in the former interpretation.

45 Fed.Reg., *supra* at 64213.

After notice and comment, however, the EEOC elected to *not* rescind the apprenticeship exemption. Its reasoning appears in a terse statement in 46 Fed.Reg. 47724, 47726 (September 29, 1981):

In response to the notice of proposed rulemaking, the Commission has received and carefully reviewed almost three hundred public comments on the apprenticeship issue. As a result of that review, the Commission has been persuaded to republish the existing interpretation without modification.

Although the EEOC saw fit to republish the exemption, this Court's independent re-

view of the language, purpose and legislative history of the ADEA confirms what the Commission acknowledged in 1980: the ADEA does not support an interpretation which would completely exclude apprenticeship programs from the Act's coverage. Having evaluated 29 CFR § 1625.13 by "the thoroughness evident in its consideration, its consistency with earlier and later pronouncements, and all other factors which give it power to persuade . . .", *Skidmore, supra,* the Court concludes that it cannot give the regulation effect. Accordingly, unless NYSE & G can establish that the age limitation in its UC & M Apprentice and Progression program is a "bona fide occupational qualification" within the meaning of 29 U.S.C. § 623(f)(1), its exclusion of Thomas Quinn is unlawful.

Plaintiffs' motion for partial summary judgment striking affirmative defenses (1), (2) and (4) from defendant's Answer to the Complaint is hereby granted. Defendant's motion for summary judgment is hereby denied.

IT IS SO ORDERED.