**Charles SCHULZE and Berner Kellough, Plaintiffs,**

v.

**ILLINOIS STATE POLICE, Defendant.**

**No. 89 C 06912.**

United States District Court,
N.D. Illinois, E.D.

May 1, 1990.

Berner Kellough, Darien, Ill., for plaintiffs.

John A. Simon, Asst. Atty. Gen., General Law Div., Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The plaintiffs, Charles Schulze and Berner Kellough, brought this two-count action against the Illinois State Police alleging violations of the federal Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* (as amended) ("ADEA"), and the Illinois Human Rights Act, *Ill.Rev.Stat.,* ch. 68, ¶¶ 1–101 *et seq.* ("IHRA"). The State Police have moved to dismiss both counts of the plaintiffs' complaint. For the following reason we deny the motion to dismiss.

### BACKGROUND

Taking the well pleaded facts in the complaint as true, the plaintiffs were Special Agent Lieutenants on the State Police assigned to the Division of Criminal Investigation ("DCI") when on December 31, 1987, they were involuntarily retired solely

because of age. At the time of their involuntary retirement, Schulze was 64 years old and Kellough was 67 years old.

Both the ADEA and the IHRA apply to state government and make it unlawful for a state to discriminate against any employee on the basis of age except where age is a *bona fide* occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age.

In favor of dismissal, the State Police argue that both the ADEA and the IHRA specifically exempt from their coverage law enforcement officers employed by a state. The October 31, 1986 amendment to the ADEA, which became effective January 1, 1987, provides:

> (i) It shall not be unlawful for an employer which is a State ... [or] an agency ... of a State ... to discharge any individual because of such individual's age if such action is taken—
>
> (1) With respect to the employment of an individual as a ... law enforcement officer and the individual has attained the age of ... retirement in effect under applicable State or local law on March 3, 1983, and
>
> (2) Pursuant to a *bona fide* ... retirement plan that is not a subterfuge to evade the purposes of this Act.

29 U.S.C. § 623(i)(1) and (2). Similarly, the Human Rights Statute provides:

> Exemptions: Nothing contained in this Act shall prohibit an employer ... from....
>
> (7) Police and Firefighter Retirement.
>
> Imposing a mandatory retirement age for ... law enforcement officers if prior to December 31, 1993, the law enforcement officer ... has attained the age of retirement in effect under applicable state or local law on March 3, 1983 and if such retirement action is taken pursuant to a *bona fide* retirement plan.

*Ill.Rev.Stat.*, ch. 68, ¶ 2–104(7). According to the State Police, the Illinois retirement law applicable to the plaintiffs and in effect on March 3, 1983 provides: "No person may be retained in service as a State policeman after he has reached 60 years of age." *Ill.Rev.Stat.*, ch. 121, ¶ 307.12–1 (1983) ("Section 12.1"). The plaintiffs, however, claim that on March 3, 1983, they were not considered "State policemen" within the meaning of that provision. They contend that Section 12.1 applied only to uniformed state troopers, and therefore the ADEA and IHRA continue to apply to DCI agents.

## ANALYSIS

The question whether, on March 3, 1983, the mandatory retirement statute applied to agents working within the DCI is a matter of state law that the Illinois courts apparently have not considered. In support of their respective positions on the state law issue, both parties point to the changing history of Illinois' organization and administration of law enforcement services.

Section 12.1, originally enacted in 1968, became effective January 1, 1969. At that time, the section provided for mandatory retirement at age 65 and the designation "State policeman" applied only to individuals who were uniformed state troopers. One year later, on January 1, 1970, the State Legislature created the Illinois Bureau of Investigation ("IBI"). Kellough began working for the IBI in 1973, and Schulze started in 1974. Effective July 1, 1974, Section 12.1 was amended, lowering the retirement age for State policemen from 65 years of age to 60. In 1977, Executive Order 77–2 and a subsequent legislative enactment abolished the IBI, reorganizing it as the Division of Criminal Investigation—one of five newly created divisions within the one Department of Law Enforcement.[1]

The State Police have not disputed that, prior to the reorganization in 1977, investigators working for the IBI were not sub-

---

1. The five divisions were designated: Division of Illinois State Police (now the Division of State Troopers), Division of Investigation, Division of Support Services (now the Division of Forensic Services and Identification), Division of Administration, Division of Internal Investigation.

ject to Section 12.1's provision for mandatory retirement—the designation "State policeman" applied only to uniformed State troopers. That undisputed fact therefore forecloses resolution of the State Police's motion based on what we would regard as the plain meaning of Section 12.1, since it is evident that the term "State policeman" was originally to be understood only as a reference to a specific category of law enforcement officers employed by the State— State troopers—rather than as a general reference to all of the State's law enforcement officers, including the plaintiffs, who might otherwise generically have been regarded as "State policemen." Because the wording of Section 12.1 did not change from the time prior to the reorganization up to March 3, 1983, we must therefore look beyond the terms of the provision for circumstances showing that by March 3, 1983, the term "State policeman" in section 12.1 included DCI special agents.

The plaintiffs claim that Director Jeremy Margolis forced them to retire on the incorrect theory that the mandatory retirement statute that had previously applied only to uniformed state troopers now applied to criminal investigators simply because the IBI was reorganized as a division of the Department of Law Enforcement in 1977. In response, the State Police argue that Margolis' theory is valid in light of the stated purpose of the reorganization, which was to establish a unified personnel system for all sworn law enforcement officers, which included abolishing the IBI and providing that persons employed by the IBI could be transferred by the Director to one of the newly created divisions within the Department of Law Enforcement. See Executive Order 77-2, April 1, 1977. The State Police contend that when the Director transferred the plaintiffs to the Department of Law Enforcement, Division of Criminal Investigation, the plaintiffs were therefore subject to the 60–year mandatory retirement age requirement. The State Police assert that a mandatory retirement age "was part and parcel of the unified personnel system for all sworn officers."

We do not believe, however, that the stated purpose and effect of transfer under Executive Order 77-2, so clearly supports that conclusion. According to Executive Order 77-2, the "unified personnel system" was established for managerial and efficiency reasons, in response to the concern that

The Department of Law Enforcement ("Department") as constituted, contains overlapping responsibilities and managerial inefficiencies which hinder the coordinated effort that is essential to effective law enforcement. Administrative functions are duplicated within internal operating divisions, line of authority are confused, and as a result, personnel are misallocated and costs are increased.

The resulting consolidation and reallocation of functions under the Executive Order was intended to remove "duplication in police radio communication systems and in personnel and fiscal management ... [and] to consolidate the investigative capabilities of the Department into two distinct divisions with defined, independent missions." Nothing about these goals, however, is suggestive of any substantive change having to do with retirement policy.

The State Police next point out that on March 3, 1983, special agents such as the plaintiffs were referred to as "State Police officers" in another paragraph of the same chapter of the Illinois Revised Statutes that contains the mandatory retirement provision. That paragraph provided in pertinent part:

Each Department of Law Enforcement officer appointed by the Director shall be classified as a State Police officer as follows: trooper, sergeant, master sergeant, lieutenant, captain or major, or as Special Agent I through VI. *Ill.Rev. Stat.*, ch. 121, § 307.8 (1983) ("Section 8").

The State Police contend that the classifications in Section 8 establish that the plaintiffs were subject to mandatory retirement. Here too, however, the conclusive effect of this provision is not nearly so clear as the State Police suggest. First, Section 307.8 is not a definition section, but pertains to the Department of Law Enforcement Merit Board's broader jurisdiction and rule mak-

ing power regarding standards and qualifications for each rank of officers employed by the Department of Law Enforcement.[2] In addition, Section 8 employs the term "State Police officer" instead of the term "State policeman." While we acknowledge that such a difference in terminology may simply be a matter of semantics, we hesitate to attribute a congruence of meaning to both terms in light of the fact discussed above that, prior to the reorganization in 1977, special agents working for the IBI were indisputably State police officers, yet they were not "State policemen" for the purposes of Section 12.1.

Moreover, if the proper analysis is to rely on other provisions as evidence on the question whether a special agent was a "State policeman" within the meaning of Section 12.1, then at least two other related provisions in effect on March 3, 1983, may be read to contradict the conclusion that the State Police would have us draw from Section 8. First, the section which opens the chapter containing Section 12.1 provided in pertinent part:

> The Department of Law Enforcement, hereinafter called the Department, shall maintain a division to be known as the Illinois State Police. The Department, by the superintendent of police, shall appoint not to exceed 1600 persons as State policemen. . . .

*Ill.Rev.Stat.*, ch. 121, ¶ 307.1 (1983) ("Section 1"). Since the superintendent of police is the individual who is in charge only of the Division of Illinois State Police, that Section may be read to suggest that only those 1600 law enforcement officers appointed to work in the Division of Illinois State Police were nominally considered "State policemen."[3]

Second, the administrative consolidation of personnel systems effected by the reorganization, on March 3, 1983, did not change the Illinois Pension Code's treatment of the position of "state policeman" as distinct from the position of "special agent." *See Ill.Rev.Stat.* ch. 108½, ¶ 14-110(a) and (d) (1983). Section 14-110 of the Illinois Pension Code dealt with an alternative retirement annuity for certain classes of State employees. Subsection (a) applied to "State policemen." Although the subsection did not describe who specifically falls into that category, it did indicate that the term "state policeman" includes the position of Superintendent of Police. As we have noted, the Superintendent of Police runs only the Division of Illinois State Police. Subsection (d) made a separate provision for "special agents." That term was clearly defined as meaning

> any person who by reason of employment by the . . . Bureau of Investigation or, after July 1, 1977, the Division of Criminal Investigation or the Division of Internal Investigation, in the Department of Law Enforcement is vested by law with duties to maintain public order, investigate violations of the criminal law of this State, make arrests and recover property. The term "special agent" includes the positions of Superintendent and Assistant Superintendent and Deputy Director.

The subsection further provided that

> Periods of service in the position of State Policeman or Division of Narcotic Control agent may be combined with periods of service as a special agent to meet the service requirements imposed under this Section for any member who served in such position before becoming a special agent.

---

**2.** Matters concerning the qualifications and promotion of IBI employees had been covered under the State Personnel Code before the personnel function for these employees had reassigned to the Department of Law Enforcement Merit Board. *See* Holland & Luking, *Executive Reorganization: An Examination of the State Experience and Article V, Section 11 of the 1970 Illinois Constitution,* 9 Loy.U.Chi.L.J. 1, 50, 52 (1977).

**3.** Arguably, Section 1 may also be interpreted as a limitation on the number of individuals, included within a larger body of those considered "State policemen," that may only be appointed to the Division of Illinois State Police. If that interpretation were correct, however, one would expect similar provisions concerning the other divisions as well. Further, subsequent amendments to the section suggest that our narrow reading of the section as it appeared on March 3, 1983, is the correct reading. *See* text below.

This section of the Pension Code, which specifically relates to issues of retirement, directly contradicts the assertion that on March 3, 1983, the position of "special agent" was synonymous with the position of "State policeman."

This fuller legislative scheme we have described establishes that a considerable ambiguity existed as to whether special agents working in the DCI were nominally considered State policemen for the purposes of Section 12.1 on March 3, 1983. Significantly, subsequent to March 3, 1983, amendments to both Section 1 and Pension Code Section 14–110 eliminated the distinction between State policeman and special agent. Amendments to Section 1 indicate that the class of those considered "State policemen" was broadened from only those employed in the Division of State Police to all those employed within the Department of Law Enforcement. Section 1 now provides: "The Department, by the Director, shall appoint State policemen, also known as State Police Officers, as provided in this act." *Ill.Stat.Ann.* ch. 121, ¶ 307.1 (1988). The alternative retirement annuity provision of the Pension Code now provides that both the term "state policeman" and the term "special agent" includes "any title or position in the Department of State Police that is held by an individual employed under 'An act in relation to the Department of State Police', approved July 20, 1949, as amended." *Id.* ch. 108½, ¶ 14–110 (referring to ch. 121, ¶¶ 307.1 *et seq.*).[4] Thus, the legislative scheme presently in effect concerning state law enforcement officers appears to have plainly resolved any ambiguity in terminology by equating all of the questioned terms. The current action of

the Director is therefore not entirely without justification. Nevertheless, for the purposes of determining whether the State Police may invoke the exemption contained in the ADEA and the IHRA as ground for dismissal, we must limit our focus to the retirement policy in effect on March 3, 1983. And as of that date, we find little in the statutory scheme to support the conclusion that the 1977 reorganization changed the State's retirement policy to bring DCI special agents under the mandatory age requirements of Section 12.1, which had formerly applied only to State troopers.

Further, we observe that the apparent practice of the State Police also belies their contention that Section 12.1 clearly applied to require mandatory retirement of DCI special agents once the reorganization took effect in 1977. There is currently on the record no explanation why, or on what authority, Kellough was permitted to work for seven years past date of his supposed mandatory retirement in 1980, and Schulze was retained for four years past the date of his supposed mandatory retirement in 1983. It may be that decisions in this jurisdiction leading up to the Supreme Court's ruling in *EEOC v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (Wy.1983), on March 2, 1983, created confusion for the State Police in implementing the mandatory retirement law even as to state troopers who clearly remained subject to age-based mandatory retirement. We know from one case, however, that immediately subsequent to the *EEOC v. Wyoming* decision, the State Police involuntarily retired at least one state trooper having reached age 60 as a "State policeman" un-

---

4. The "Department of State Police" referred to in these provisions was formerly the "Department of Law Enforcement." The reason for the change of name itself evidences that as of March 3, 1983, special agents such as the plaintiffs were not nominally considered State policemen. An executive order brought about the name change in July, 1985, in order to address a problem arising from the fact that under the reorganization, only personnel within one division, the Division of Illinois State Police, were given the title of State Police. *See* Exec.Order 85–3, July 1, 1985. Apparently, the sole designation of the single division and its personnel as State Police resulted in confusion causing de-

layed services as a result of improper or misguided requests for certain services. In order to remedy that problem, the Executive Order, and corresponding legislation, renamed the Department of Law Enforcement as the Department of State Police. *Id.* The division that had been known as the Division of State Police was then renamed the Division of State Troopers. We note that, though the renaming finally resulted in all personnel within the former Department of Law Enforcement being given the title of State Police, even at that time the executive order never suggested that the reason for the nominal change had anything to do with confusion regarding mandatory retirement policy.

der Section 12.1. *See Popkins v. Zagel,* 611 F.Supp. 809 (C.D.Ill.1985). Yet, there apparently is no evidence that the State Police involuntarily retired officers from any of the other divisions in the Department of Law Enforcement at any time prior to December 31, 1987, ten years after the reorganization, and four years after *EEOC v. Wyoming.*[5] Of course, the failure to implement an otherwise applicable law against certain individuals does not necessarily mean that an entity has waived the right to later enforce the law against those same individuals. Our purpose in raising the issue of past practice, however, is to arrive at a determination of the threshold question whether the law was even applicable to certain individuals in the first place. In light of what we regard as an ambiguous statute, the perception and practice of the agency charged with enforcing the statute, particularly during events at past points in time that the agency now claims effected a change in substantive retirement policy—e.g. the reorganization—becomes relevant to that question.

## CONCLUSION

■ For the foregoing reasons, we are unable to conclude as a matter of law that the mandatory retirement provision applied to investigators on March 3, 1983.[6] There-

fore, the State Police may not rely on the ADEA and IHRA exemption as a per se justification for discharging the plaintiffs. Our decision does not resolve the case, however, since a question of fact remains as to whether there were other reasons for the plaintiffs' discharge that were not age based, or, assuming the statutory amendments enacted since March 3, 1983 have effectively extended the mandatory retirement provision to DCI personnel, whether age is a BFOQ for such individuals.[7]

Accordingly, the State Police's motion to dismiss is denied. It is so ordered.

---

5. The plaintiffs additionally state in their response that they were not notified about any change in retirement policy until September 15, 1987, when they were told by Director Jeremy Margolis that they would have to retire December 31, 1987.

6. We therefore do *not find persuasive the recent* slip opinion of the court in *Burke v. Margolis,* 738 F.Supp. 1201 (C.D.Ill. 1990). *Burke* involved an ADEA claim that was apparently identical to the claim raised here, although there was some debate as to precisely what position the plaintiff held in the Department of Law Enforcement. Dismissing the action against the State Police, the court broadly asserted that Illinois State Police have been subject to mandatory retirement at age 60 since at least mid-1974. The court further stated that the "Plaintiff was employed by the Illinois State Police and its predecessor agencies from 1968 until his retirement." Relying exclusively on Section 307.8, the court then concluded that it was immaterial whether the plaintiff was a master sergeant, a special agent or a master sergeant special agent

at the time of his retirement since "[e]ach of these positions is classified as an Illinois State Policeman." *Id.* at 4. Significantly, the court made no mention of the fact raised here that, at least up to the time of the 1977 reorganization, none of the police personnel working in the predecessor agencies, other than State troopers, were subject to mandatory retirement. Nor does the court consider any other related statutory provisions or legislative history bearing upon the question of the applicability of the mandatory retirement provision.

7. The plaintiffs have essentially raised the BFOQ claim when they assert that

> the duties for criminal investigators is [sic] so different from the duties of state troopers that there are logical reasons for a separate type of mandatory retirement. Age does not amount to a legitimate qualification for criminal investigators, but it might be for uniformed troopers.

We need not address that issue, however, on the motion to dismiss.